UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
MALTHE THOMSEN,                        :        15cv2668 (DLC)
                                       :
                    Plaintiff,         :        OPINION AND ORDER
                                       :
        -v-                            :
                                       :
CITY OF NEW YORK; WILLIAM BRATTON,     :
Commissioner of the New York City      :
Police Department, in his individual   :
and official capacities; Detective     :
NELA GOMEZ, in her individual and      :
official capacities; Assistant         :
District Attorney RACHEL FERRARI, and  :
Assistant District Attorney NICOLE     :
BLUMBERG, in their individual and      :
official capacities; MARIA ANGELIKI    :
KEFALAS (a/k/a Mariangela Kefalas/Gigi :
Kefalas), in her individual capacity,  :
                                       :
                    Defendants.        :
                                       :
-------------------------------------- X

APPEARANCES:

For the Plaintiff:

David N. Fisher
Kaitlin Fleur Nares
Jane H Fisher-Byrialsen
Fisher & Byrialsen PLLC
99 Park Avenue, 26th floor
New York, NY 10016

For the City Defendants:

Qiana Charmaine Smith
NYC Law Department, Office of the Corporation Counsel (NYC)
100 Church Street
New York, NY 10007

For the DA Defendants:

Patricia Jean Bailey
Elizabeth Norris Krasnow
New York County District Attorney's Office
One Hogan Place
New York, NY 10013

For defendant Mariangela Kefalas:

Lawrence Scott Wasserman
Russell Louis Porter
Gordon & Silber, P.C.
355 Lexington Avenue
New York, NY 10017

DENISE COTE, District Judge:

This case arises from the arrest and prosecution of Malthe Thomsen ("Thomsen").  Thomsen was prosecuted for sexually abusing children while he was a teacher at the International Preschool ("IPS").  He alleges that Mariangela Kefalas ("Kefalas"), a colleague of his, intentionally made the false report on which his arrest and prosecution were based and that false statements that government officials made to him about the strength of the evidence against him caused him to give a false confession.  Each of the defendants filed a motion to dismiss the complaint in its entirety.  For the reasons that follow, the motion to dismiss is granted with respect to the DA Defendants. The City Defendants' motion to dismiss is granted in part. Kefalas's motion to dismiss is denied.

## Background

These facts are taken from the complaint, its attached
exhibits, or documents integral to the complaint.  Thomsen
brought this suit against three sets of defendants.  The first
is the City Defendants, which include the City of New York
("City"), William Bratton ("Bratton"), and Detective Nela Gomez
("Gomez") of the New York Police Department ("NYPD").  The
second is the District Attorney ("DA") Defendants, which include
Assistant DA Rachel Ferrari ("Ferrari") and Assistant DA Nicole
Blumberg ("Blumberg").  The last defendant is Kefalas, who is
being sued in her private capacity under state law.

Thomsen is a 23-year-old man from Denmark who interned at
IPS for a semester.  He was assigned to work in the "Blue Room"
alongside three teachers, including Kefalas.  Kefalas had many
problems during her employment at IPS.  Specifically, she
received negative evaluations indicating that she was defensive,
did not work well with others, and could not handle criticism.
More importantly, the complaint alleges that Kefalas made
numerous false reports against other teachers at IPS.

On May 30, 2014, Kefalas wrote an email to IPS that
accused Thomsen of sexually abusing children at the school.  The
complaint alleges that Kefalas wrote the email to seek revenge
on her colleagues for her negative reviews and her demotion.
Kefalas purportedly said to an IPS administrator that she was

"against" Thomsen and complained that he "unfriended" her on
Facebook.  The complaint alleges that Kefalas accused Thomsen of
sexual abuse for malicious reasons and knew that her claim was
false.

On June 2, 2014, IPS's Chief Administrative Officer met
with Kefalas and initiated an investigation.  IPS investigated
Kefalas's complaint by conducting undisclosed observations of
Thomsen and interviewing several IPS staff members.  Each IPS
staff member who was interviewed said that Kefalas's allegations
were false and provided positive reviews of Thomsen's work.  On
June 5, Kefalas told IPS staff that she had video recordings of
the alleged sexual abuse.  She refused to turn over this
evidence, however, and was fired for insubordination that same
day.  IPS closed its investigation and determined that Thomsen
had not sexually abused children.

On June 10, 2014, Kefalas reported the same allegations
against Thomsen to the NYPD.  Early in the morning of June 27,
Gomez and another officer woke Thomsen in his apartment and told
him to come to the police station.  Gomez took Thomsen to a
locked room and read him his Miranda rights, which he waived.
Gomez then interrogated Thomsen in a manner that, according to
the complaint, was consistent with the policies of the NYPD and
included the "false evidence ploy," minimization, and promises
of leniency if Thomsen cooperated.  For example, Gomez told

Thomsen that she would wait with him all day until he admitted to abusing children and threatened that the DA would be harsh with him if he did not confess to the allegations. Moreover, Gomez lied when she told Thomsen that she had seen a video of him taking children's hands and placing them on his genitals. Gomez even used gestures to demonstrate what she claimed to have seen in the video of the abuse; she had in fact seen no such video. Gomez did not record Thomsen's interrogation. Thomsen alleges that there is a de facto policy or custom of not recording police interrogations, and this policy leads to false confessions.

Thomsen proclaimed his innocence during the initial portion of the interrogation. He also told Gomez about the IPS investigation that was resolved in his favor and about the issues with Kefalas's behavior. In particular, Thomsen told Gomez that Kefalas refused to produce video evidence of the alleged abuse during IPS's investigation. Gomez left Thomsen alone for a while, a tactic meant to create feelings of isolation and hopelessness that often leads to false confessions.

Gomez returned and took a written statement from Thomsen that largely memorialized the information that she gave him. Throughout the long interrogation, Gomez used allegedly manipulative tactics to make Thomsen believe that he had abused

children and repressed those memories.  At the time he completed a written confession to criminal conduct, Thomsen had no actual memory of abusing children and relied on Gomez's representation that a video of the conduct existed.  After Thomsen signed the statement, Gomez asked him to add the specific detail that the abuse took place only in his classroom at IPS.  Thomsen complied.  Gomez further told Thomsen that he had to repeat what he said in the written statement when he spoke to the DA.

At about 11:30 a.m. on June 27, Gomez took Thomsen to the DA's office.  Gomez allegedly spoke with Ferrari before Ferrari conducted a recorded video interview with Thomsen.  Gomez was present at the recorded interview.  In response to Ferrari's questions, Thomsen indicated that his answers were based on his interview with Gomez and the information she had given him about Kefalas's video of the alleged abuse.  Ferrari did not correct Thomsen's belief that Kefalas took videos of him putting children's hands on his genitals.[1]  Moreover, Thomsen continued to state during the interview that he did not remember touching any children inappropriately.  After giving his statement to Ferrari, Thomsen was taken back to the police station.  Gomez

---

[1] It is not clear precisely when Ferrari obtained the videos that Kefalas took of Thomsen in the classroom at IPS.  Those videos, which Kefalas submitted as an exhibit attached to her motion to dismiss, do not show any criminal conduct, let alone the conduct Gomez claimed was recorded on the videos.

then informed Thomsen that Ferrari had instructed her to arrest
him.  Thomsen was ultimately arrested at 4:10 p.m.

On June 29, 2014, Thomsen was arraigned on fifteen counts
of Sexual Abuse in the First Degree pursuant to NYPL §
130.65(3).  Ferrari told Thomsen's attorneys that his case would
be presented to a grand jury on July 3; instead, Ferrari took
the case to a preliminary hearing.  According to the complaint,
Ferrari chose to pursue a preliminary hearing rather than a
grand jury indictment because she had no evidence that
corroborated Thomsen's confession; such evidence would be
required for a grand jury to indict him, but was not necessary
at a preliminary hearing.  Ferrari chose not to call Kefalas as
a witness at the preliminary hearing.  The evidence presented at
the preliminary hearing consisted of the videotaped interview
with Ferrari and Ferrari's testimony about that interview.

On July 9, 2014, Thomsen posted bail and was released from
jail after thirteen days in custody.  On November 13, the DA's
office moved to dismiss the charges against Thomsen because the
investigation did not produce any reliable evidence that
corroborated Thomsen's confession.  Kefalas did take videos in
connection with her complaint, but those videos do not show that
Thomsen touched children inappropriately.  As described in the
complaint, Gomez's decision to lie about the evidence she had
against Thomsen led him to confess to a serious crime that it is

now evident he did not commit.  As a foreign student who is unfamiliar with the ways of our criminal justice system, Thomsen was particularly vulnerable to this interrogation technique. Moreover, law enforcement officials did not pause sufficiently to consider the possibility that Thomsen's weak and hypothetically-phrased confession was false.

As a result, Thomsen was exposed to psychological and physical trauma.  He was incarcerated for thirteen days at Rikers Island.  He was subjected to a great deal of negative and sensationalist press coverage.  His name is now linked with these horrible events.  Thus, according to the complaint, Thomsen's arrest and continued prosecution in light of an investigation that uncovered no reliable evidence against him violated his rights.

Thomsen brings several causes of action based on these events.  Against the individual City and DA defendants, Thomsen alleges: (1) violations of the Fourth, Fifth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983; (2) conspiracy to violate his rights under the Fourteenth Amendment pursuant to 42 U.S.C. §§ 1983 and 1985(3); and (3) state law claims for malicious prosecution, intentional infliction of emotional distress, and violation of unspecified rights under the New York

State Constitution.[2]   Against the City of New York, Thomsen brings a Monell claim under 42 U.S.C. § 1983 for violations of his rights by both the ADA's and the police officers involved in his arrest and prosecution.   Against Kefalas, Thomsen alleges the following state law claims: (1) intentional infliction of emotional distress; (2) injurious falsehood; (3) libel; (4) slander; (5) negligent infliction of emotional distress; (6) negligence; and (7) prima facie tort.   Thomsen agreed to dismiss the following claims voluntarily: (1) claims against Bratton; (2) claims that his Sixth Amendment right to counsel was violated; (3) equal protection claims under the Fourteenth Amendment and § 1983; (4) claims related to his registration on the Child Abuse and Maltreatment Registry; and (5) his claim that his constitutional right to familial association was violated.

The complaint was filed on April 6, 2015.   The DA Defendants filed the first motion to dismiss on June 15.   The City Defendants filed an answer on June 15.   It took Kefalas some time to secure an attorney.   An initial conference was held on July 10.   At that conference, the Court granted Thomsen an opportunity to amend his complaint and denied the DA Defendants' motion to dismiss as moot.   On July 31, Thomsen filed an amended

---

[2] Thomsen also alleges that the City itself is liable for these state law claims under a theory of respondeat superior.

complaint.  On September 3, the DA Defendants, Kefalas, and the
City Defendants each filed a separate motion to dismiss the
amended complaint.  Those motions became fully submitted on
December 7, December 11, and December 14, respectively.

## Discussion

When deciding a motion to dismiss under Rule 12(b), Fed. R.
Civ. P., a court must "accept all allegations in the complaint
as true and draw all inferences in the non-moving party's
favor."  LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d
471, 475 (2d Cir. 2009).  "To survive a motion to dismiss under
Rule 12(b)(6), a complaint must allege sufficient facts which,
taken as true, state a plausible claim for relief."  Keiler v.
Harlequin Enters. Ltd., 751 F.3d 64, 68 (2d Cir. 2014); Ashcroft
v. Iqbal, 556 U.S. 662, 678 (2009) ("[A] complaint must contain
sufficient factual matter, accepted as true, to state a claim
for relief that is plausible on its face.").  "A claim has
facial plausibility when the plaintiff pleads factual content
that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged."  Parkcentral
Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208
(2d Cir. 2014) (citation omitted).

In deciding a motion to dismiss, the court considers "any
written instrument attached to the complaint as an exhibit or
any statements or documents incorporated in it by reference."

Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100 (2d Cir. 2015) (citation omitted).  Thomsen has attached several exhibits to his complaint, including excerpts from transcripts of state court proceedings, his written confession, and a video of his interview with Ferrari.

Thomsen's complaint contains both federal and state law claims against each of the defendants.  Supplemental jurisdiction exists over state law claims "that are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  In other words, federal courts may assert supplemental jurisdiction over claims that "derive from a common nucleus of operative fact."  Delaney v. Bank of Am. Corp., 766 F.3d 163, 170 (2d Cir. 2014) (citation omitted).  A district court may "exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction."  Parker v. Della Rocco, 252 F.3d 663, 666 (2d Cir. 2001) (citation omitted); see also Kroshnyi v. U.S. Pack Courier Servs., Inc., 771 F.3d 93, 102 (2d Cir. 2014).  To decide whether to do so, the court must weigh "the traditional 'values of judicial economy, convenience, fairness, and comity.'"  Kolari v. New York-Presbyterian Hosp., 455 F.3d 118,

11

122 (2d Cir. 2006) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)).

Here, the state law claims may be resolved without considering any novel or complex questions of state law.  See Carver v. Nassau Cnty. Interim Fin. Auth., 730 F.3d 150, 153-54 (2d Cir. 2013).  Convenience and judicial economy weigh in favor of resolving the state law claims as part of this litigation.

## I.   DA Defendants Ferrari and Blumberg

The DA Defendants are absolutely immune from Thomsen's federal and state law claims.  It is appropriate to consider claims of absolute or qualified immunity at the motion to dismiss stage.  See Drimal v. Tai, 786 F.3d 219, 225 (2d Cir. 2015).  Absolute immunity bars a civil suit against a prosecutor for functions that are "intimately associated with the judicial phase of the criminal process."  Simon v. City of New York, 727 F.3d 167, 171 (2d Cir. 2013) (citation omitted).  "These functions include deciding whether to bring charges and presenting a case to a grand jury or a court, along with tasks generally considered adjunct to those functions, such as witness preparation."  Id.  "This immunity attaches to . . . conduct preliminary to the initiation of a prosecution and actions apart from the courtroom."  Giraldo v. Kessler, 694 F.3d 161, 165 (2d Cir. 2012) (citation omitted).  Absolute immunity for prosecutors is thus "broadly defined."  Id. (citation omitted).

Courts apply a "functional approach" in determining whether absolute immunity attaches.  Simon, 727 F.3d at 171 (citation omitted).  "[P]rosecutors receive only qualified immunity when performing administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." Id. at 172 (citation omitted); Morse v. Fusto, 804 F.3d 538, 548 (2d Cir. 2015) (no absolute immunity for activities "normally performed by a detective or a police officer" (citation omitted)).  Accordingly, a prosecutor is absolutely immune when authorizing an arrest, but is entitled only to qualified immunity for executing an arrest warrant.  Simon, 727 F.3d at 172; Barr v. Abrams, 810 F.2d 358, 362 (2d Cir. 1987). Analyzing a claim for absolute immunity "requires [courts] to view the relevant circumstances as would a reasonable official in the claimant's position." Giraldo, 694 F.3d at 165.  The "relevant question, therefore, is whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor." Id. at 166. This is true "even in the face of a complaint's allegations of malicious or corrupt intent behind the acts."  Id.

The DA Defendants are entitled to absolute immunity for interviewing and prosecuting Thomsen.  Ferrari interviewed him, which is part of her core function in deciding whether to bring

charges.  See id.  Moreover, the decision to hold a preliminary hearing instead of seeking a grand jury indictment is central to prosecutorial discretion.

Thomsen's arguments to the contrary are unavailing. Thomsen primarily argues that the DA Defendants are not absolutely immune because their actions were investigatory and therefore were outside the scope of their core judicial functions.  In so arguing, Thomsen points to the fact that Ferrari's interview with Thomsen took place before he was arrested, and that Ferrari and Gomez communicated with each other immediately before Thomsen's arrest.  These facts, Thomsen argues, show that the interview constituted pre-arrest investigative activity more properly considered a function of the police.[3]  This argument is misplaced because "evaluating evidence and interviewing witnesses" falls on the "absolute immunity side of the line, leaving searching for the clues and

---

[3] Thomsen relies on several cases in making this argument, none of which support this narrow view of absolute prosecutorial immunity.  E.g., Buckley v. Fitzsimmons, 509 U.S. 259, 274 (1993) (holding that prosecutors were not absolutely immune for "endeavoring to determine whether the bootprint at the scene of the crime had been made by" the defendant's foot because this was more akin to police work); Barbera v. Smith, 836 F.2d 96, 100 (2d Cir. 1987) (prosecutor was not absolutely immune for working on securing the cooperation of a witness during an investigation that preceded the prosecution because such actions constituted "supervision of and interaction with law enforcement agencies in acquiring evidence which might be used in prosecution").

corroboration that might lead to a recommendation for an arrest on the qualified immunity side." Id. (citation omitted). Indeed, "good prosecutors may -- usually should -- perform acts reasonably characterized as investigative at all phases of a criminal proceeding." Id. Thus, "[v]iewed through the eyes of a reasonable prosecutor," the DA Defendants' actions "were well within their legitimate functions as prosecutors." Id. at 167.

## II.  Defendants Gomez and the City of New York

The City Defendants primarily argue that Thomsen's suit should be dismissed because (1) the confession was not coerced; (2) there was probable cause to arrest and prosecute Thomsen; (3) they are protected by qualified immunity; and (4) there are no facts in the complaint demonstrating a policy or practice that would give rise to a plausible Monell claim, in part because Thomsen's constitutional rights were not violated. Section 1983 provides a cause of action for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  In other words, "[t]o state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." McGugan v. Aldana-Bernier, 752 F.3d 224, 229 (2d Cir. 2014), cert. denied, 135 S. Ct. 1703 (2015).

Further, "in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). Vicarious liability is not applicable to § 1983 suits. Littlejohn v. City of New York, 795 F.3d 297, 314 (2d Cir. 2015). Thus, "to impose liability on a municipality under § 1983, a plaintiff must identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Newton v. City of New York, 779 F.3d 140, 152 (2d Cir. 2015) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)).

**A. § 1983 Claims Against Gomez**

Thomsen alleges that Gomez violated his Fourth and Fifth Amendment rights as well as the Due Process Clause of the Fourteenth Amendment. These claims are largely based on the allegation that Gomez coerced Thomsen's confession by lying about the existence of evidence against him and using other interrogation tactics that were manipulative. The City Defendants have construed these claims as for false arrest and malicious prosecution, and that Thomsen alleges essentially that Gomez violated his right to be free from arrest and prosecution

in the absence of probable cause.[4]  See <u>Ricciuti v. N.Y.C.</u>
<u>Transit Auth.</u>, 124 F.3d 123, 128 (2d Cir. 1997).  Thomsen's
claims under the Fifth Amendment are also construed here to
include violations of his right to be free from involuntary
self-incrimination.

**1. False Arrest and Malicious Prosecution**

A false arrest claim requires a plaintiff to prove "(1) the
defendant intended to confine the plaintiff, (2) the plaintiff
was conscious of the confinement, (3) the plaintiff did not

---

[4] Based on his opposition to the City Defendants' motion to
dismiss, it appears that Thomsen also alleges that Gomez, along
with the DA Defendants, violated his rights under <u>Brady v.</u>
<u>Maryland</u>, 373 U.S. 83 (1963).  Thomsen bases this claim on the
fact that, during his interrogation, Gomez lied about having a
video of him abusing children.  The failure to disclose that
there was no such evidence led to Thomsen's confession and
confinement.  "<u>Brady</u> information . . . must be disclosed in a
manner that gives the defendant a reasonable opportunity either
to use the evidence in the trial or to use the information to
obtain evidence for use in the trial." <u>United States v.</u>
<u>Rittweger</u>, 524 F.3d 171, 180 (2d Cir. 2008) (citation omitted).
Moreover, "it is not feasible or desirable to specify the extent
or timing of disclosure <u>Brady</u> and its progeny require" except in
terms of the "defense's opportunity to use the evidence when the
disclosure is made." <u>Id.</u> at 180-81 (citation omitted).  "[T]he
police satisfy their obligations under <u>Brady</u> when they turn
exculpatory evidence over to the prosecutors." <u>Walker v. City</u>
<u>of New York</u>, 974 F.2d 293, 299 (2d Cir. 1992).  This is so
because "prosecutors, who possess the requisite legal acumen,
[should] be charged with the task of determining" what
information is subject to disclosure under <u>Brady</u>. <u>Id.</u>; <u>see</u>
<u>Bermudez v. City of New York</u>, 790 F.3d 368, 376 n.4 (2d Cir.
2015).  Thus, Thomsen's claim fails for two reasons: (1) <u>Brady</u>
is essentially a trial right, and Thomsen was neither tried nor
convicted; and (2) he does not allege that Gomez failed to
disclose exculpatory evidence to the DA Defendants.

consent to the confinement and (4) the confinement was not
otherwise privileged." Liranzo v. United States, 690 F.3d 78,
95 (2d Cir. 2012) (citation omitted).  "To avoid liability for a
claim of false arrest, an arresting officer may demonstrate that
either (1) he had probable cause for the arrest, or (2) he is
protected from liability because he has qualified immunity."
Simpson v. City of New York, 793 F.3d 259, 265 (2d Cir. 2015).
An officer "has probable cause to arrest when he or she has
knowledge or reasonably trustworthy information of facts and
circumstances that are sufficient to warrant a person of
reasonable caution in the belief that the person to be arrested
has committed or is committing a crime." Garcia v. Does, 779
F.3d 84, 92 (2d Cir. 2015) (citation omitted).  "Probable cause
is determined on the basis of facts known to the arresting
officer at the time of the arrest." Shamir v. City of New York,
804 F.3d 553, 557 (2d Cir. 2015) (citation omitted).  The
arresting officer is "not required to explore and eliminate
every theoretically plausible claim of innocence before making
an arrest." Garcia, 779 F.3d at 93 (citation omitted).  "At
most, probable cause may be defeated if the officer deliberately
disregards facts known to him which establish justification."
Id. (citation omitted).

      "To establish a malicious prosecution claim . . . a
plaintiff must prove (1) the initiation or continuation of a

criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Stampf v. Long Island R. Co., 761 F.3d 192, 198 (2d Cir. 2014) (citation omitted). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution." Stansbury v. Wertman, 721 F.3d 84, 94-95 (2d Cir. 2013) (citation omitted).

"The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." Id. at 95. "Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Id. (citation omitted).

In addition to arguing that there was probable cause to arrest Thomsen, Gomez contends that qualified immunity protects her from suit. "Qualified immunity protects public officials performing discretionary functions from personal liability in a civil suit for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Morse, 804 F.3d at 546 (citation omitted). Qualified immunity "balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield

officials from harassment, distraction, and liability" when they act reasonably.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (per curiam).

"Whether qualified immunity applies turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." <u>Morse</u>, 804 F.3d at 546 (citation omitted).  A right is "clearly established if it would be clear to a reasonable public official that his conduct was unlawful in the situation he confronted." <u>Id.</u> (citation omitted).  An officer "is entitled to qualified immunity against a suit for false arrest if he can establish that he had arguable probable cause to arrest the plaintiff." <u>Garcia</u>, 779 F.3d at 92 (citation omitted). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." <u>Id.</u> (citation omitted).  Courts "look to the information possessed by the officer at the time of arrest" when determining whether an officer's conduct was objectively reasonable.  <u>Id.</u> (citation omitted).[5]

---

[5] New York has a similar immunity doctrine, such that if granting this motion on qualified immunity grounds is appropriate, it would also be appropriate to dismiss the state law claim for

Probable cause existed to arrest and prosecute Thomsen, despite the fact that his prosecution was later dismissed because the DA Defendants determined that there was not sufficient evidence to support the case against him.  Kefalas's report led Gomez to question Thomsen.  Thomsen wrote out a clear, if hesitant, confession to sexual wrongdoing involving children.  Although Thomsen is innocent of any inappropriate conduct involving children at IPS, Gomez at the time had sufficient facts available to her to render her decision to arrest Thomsen objectively reasonable.  At the very least she is protected by qualified immunity because officers of reasonable competence could disagree about whether there was probable cause to arrest Thomsen.

Thomsen's arguments to the contrary do not negate the existence of probable cause for his arrest.  Thomsen's primary argument is that Gomez fabricated evidence in support of probable cause, thereby rendering unreasonable Gomez's determination that probable cause existed.  Gomez did not actually fabricate the evidence supporting Thomsen's arrest, however.  Thomsen wrote his statement that contained a confession to inappropriate activity.  Although the confession is now known to be false, Gomez did not invent it.  Therefore,

---

false arrest.  See Jenkins v. City of New York, 478 F.3d 76, 88 (2d Cir. 2007).

the confession, along with Kefalas's report to the NYPD, together provide sufficient support for Thomsen's arrest such that his constitutional rights were not violated.  Thomsen argues that Gomez was aware of facts that called Kefalas's credibility into question.  Even if this is true, and if Kefalas's report alone was not sufficient to establish probable cause, Thomsen's statements both to Gomez and Ferrari were.

The facts in the complaint are also insufficient to sustain a malicious prosecution claim against Gomez.  An element of malicious prosecution is a lack of probable cause.  As discussed above, after Thomsen confessed both in writing and during his recorded interview with Ferrari and Gomez, there was probable cause for his arrest and prosecution.  Those interviews gave Gomez and the DA Defendants information such that a reasonably prudent person could believe that Thomsen was guilty of the charged crimes.

Thomsen's malicious prosecution claim against Gomez suffers from another defect: Gomez, as a police officer, did not initiate or continue the prosecution after she arrested Thomsen. The DA Defendants' exercise of independent judgment broke the chain of causation such that his continued prosecution is fairly attributable to them, not Gomez.  "[P]olice officers do not generally 'commence or continue' criminal proceedings against defendants."  Bermudez, 790 F.3d at 377.  There is an exception

when police officers "play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act."  Id. (citation omitted).  Gomez's conduct in arresting Thomsen and sitting with Ferrari during the recorded interview does not rise to the level of an "active role" in the prosecution.  The complaint indicates that Ferrari instructed Gomez to arrest Thomsen.  Thus, there are two grounds for dismissing the malicious prosecution claim against Gomez: (1) there was probable cause to prosecute Thomsen; and (2) Gomez did not "commence or continue" the prosecution, as the elements of the claim require.

Thomsen's arguments in support of his malicious prosecution claim are unavailing.  Thomsen primarily argues that, even if probable cause existed at the time of his arrest, it dissipated when his prosecution began.  See Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996), as amended (May 21, 1996). Moreover, Thomsen argues that Gomez was the "proximate cause" of his prosecution because she lied about the existence of evidence against him, elicited a false confession, and gave that information to Ferrari.  Thomsen's argument rests on cases holding that the intervening acts of prosecutors do not break the chain of causation when police officers "deliberately suppl[y] misleading information that influenced" the decision to prosecute.  Zahrey v. Coffey, 221 F.3d 342, 352 (2d Cir. 2000)

23

(citation omitted); see Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (clarifying the circumstances when the chain of causation is broken in a malicious prosecution claim).

Gomez's conduct cannot fairly be characterized as intentionally fabricating evidence and forwarding that information to prosecutors.  Thomsen has not alleged that Gomez fabricated his confession, only that she lied to Thomsen about video evidence when none was in the police's possession.  Nor does the complaint assert that Gomez lied to Ferrari about the video.  The intervening, independent decision by the ADAs to prosecute Thomsen thus broke the chain of causation such that Gomez is not responsible for the decision to commence or continue Thomsen's prosecution.

**2. Fifth Amendment and Compulsory Self-Incrimination**

The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." It is axiomatic that statements obtained in violation of the Fifth Amendment are not admissible against the defendant who provided the statements involuntarily.  United States v. Taylor, 745 F.3d 15, 23 (2d Cir. 2014), reh'g denied 752 F.3d 254, 269 (2d Cir. 2014).  This is true even where a suspect executed a knowing and voluntary waiver of his Miranda rights.  Id. at 19-20.  In other words, a "knowing and voluntary [Miranda] waiver

does not . . . guarantee that all subsequent statements were voluntarily made." Id. at 23 (citation omitted).

"[A] § 1983 action may exist under the Fifth Amendment self-incrimination clause if coercion was applied . . . to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff[] in a criminal proceeding." Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 346 (2d Cir. 1998). "[U]se or derivative use of a compelled statement at any criminal proceeding against the declarant violates that person's Fifth Amendment rights; use of the statement at trial is not required." Higazy v. Templeton, 505 F.3d 161, 171 (2d Cir. 2007) (citation omitted) (holding that using a coerced statement against a defendant during his initial appearance violated the Fifth Amendment). "Such use, if the confession is found to have been coerced, violates the declarant's constitutional rights." Id. (citation omitted).

"It is difficult to determine whether a confession is voluntary; case law yields no talismanic definition for the term." Taylor, 745 F.3d 24 (citation omitted). Courts "look at the totality of circumstances surrounding a Miranda waiver and any subsequent statements to determine knowledge and voluntariness." Id. at 23. "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." Id. (citation omitted). Determining

the voluntariness of a confession is a fact-intensive inquiry
that requires considering "the accused's characteristics, the
conditions of interrogation, and the conduct of law enforcement
officials." Id. at 24 (citation omitted).  Moreover, "the use
of coercive and improper tactics in obtaining an initial
confession may warrant a presumption of compulsion as to a
second one, even if the latter was obtained after properly
administered Miranda warnings." Id. at 25 (citation omitted).
"In deciding whether a second confession has been tainted by the
prior coerced statement, the time that passes between
confessions, the change in place of interrogations, and the
change in identity of interrogators all bear on whether that
coercion has carried over into the second confession." Id. at
25-26 (citation omitted).

Thomsen has pled a plausible claim that his right to be
free from compulsory self-incrimination was violated.  Such a
claim requires that the statement at issue was coerced and that
the State made use or derivative use of that statement at a
criminal proceeding.  Thomsen's claim that his will was overcome
in this case is plausible.  See Weaver v. Brenner, 40 F.3d 527,
537 (2d Cir. 1994) (finding a genuine issue of material fact
regarding the voluntariness of a confession where the officers
promised to keep the case out of the newspaper if the arrestee
confessed, claimed that there was powerful evidence against the

arrestee where none existed, and otherwise psychologically manipulated the arrestee).

The State also made at least derivative use of his written confession during the preliminary hearing when it relied on Ferrari's testimony and her videotaped interview with Thomsen. Ferrari mentioned the written statement in her testimony at the preliminary hearing and the written statement was discussed during the videotaped interview that itself was played at the preliminary hearing.

The City Defendants did not address in their motion to dismiss the issue of compelled self-incrimination, the legal principles recited here, or the application of qualified immunity to this Fifth Amendment claim.  The City Defendants did generally outline their position, however, that Thomsen's confession was voluntarily given because each of the interrogation tactics that Gomez used has been found to be permissible by New York state courts.  Mirroring the moving brief, the plaintiff's opposition did not separately discuss his Fifth Amendment claim.  Thus, Thomsen's Fifth Amendment and Due Process claim under a theory of compulsory self-incrimination survives.

### B. **Monell** Claims Against the City

As discussed above, a municipality may be held liable under § 1983 for a policy or custom that caused the plaintiff's

constitutional injury.  Newton, 779 F.3d at 152.  To satisfy a
motion to dismiss, the "plaintiff need not identify an express
rule or regulation, but can show that a . . . practice of
municipal officials was so persistent or widespread as to
constitute a custom or usage."  Littlejohn, 795 F.3d at 315
(citation omitted); Newton, 779 F.3d at 152 (a municipal policy
may be a "persistent, widespread course of conduct . . . that
has become the usual and accepted way of carrying out policy . .
. even though the municipality has not necessarily formally
adopted or announced the custom" (citation omitted)).

     Thomsen has not pled sufficient facts to make his Monell
claim based on the conduct the DA Defendants plausible.  His
Monell claims based on the conduct of Gomez and the policies of
the NYPD are dismissed in part.  As discussed above, there was
probable cause for Thomsen's arrest and prosecution.  Therefore,
he did not suffer a constitutional violation that could provide
the foundation for a Monell claim against the City based on
false arrest or malicious prosecution claims for either Gomez or
the DA Defendants.  The motion to dismiss Thomsen's Monell claim
that derives from the claimed violation of his rights under the
Fifth Amendment discussed above is denied, however.

     Thomsen's arguments in support of his remaining Monell
claims are not persuasive.  Thomsen has alleged the existence of
two policies pursuant to which his constitutional rights were

28

allegedly violated: (1) the NYPD has a policy of not recording police interviews; and (2) the NYPD has a policy of using interrogation tactics that encourage false confessions. According to the complaint, these tactics include lying about evidence against an arrestee, minimizing the seriousness of the accused conduct, and promising leniency if the arrestee cooperates.  Because there was probable cause for Thomsen's arrest and prosecution, these tactics -- which in general do not violate the law -- cannot form the basis for a Monell claim premised on false arrest or malicious prosecution.

Thomsen also points to several specific paragraphs of the amended complaint in arguing that his Monell claim against the City for the conduct of the DA Defendants is plausible.  These allegations in the complaint are largely general in nature and accuse the City, including the District Attorney, of failing to train or supervise ADA's regarding constitutional violations, particularly violations of Brady.  These assertions are too conclusory to plead a Monell claim.  Thomsen alleges that there were meetings at which high level supervisors, including the District Attorney, learned about Thomsen's prosecution and allowed it to go forward for several months despite the lack of evidence supporting the prosecution's case.  The allegations do not identify a policy or custom that resulted in a violation of

Thomsen's constitutional rights, however, and therefore are not actionable under § 1983.

### C. Conspiracy Claims under §§ 1983 and 1985(3)

In order to survive a motion to dismiss on a § 1983 conspiracy claim, Thomsen must "allege (1) an agreement between a state actor and a private party (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Ciambriello v. Cty. of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).  Complaints "containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient."  Id. at 325 (citation omitted).

42 U.S.C. § 1985(3) provides in relevant part that "[i]f two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . . the party so injured or deprived may have an action for the recovery of damages."  A conspiracy claim under § 1985(3) requires a plaintiff to allege:

> 1) a conspiracy; 2) for the purpose of depriving,
> either directly or indirectly, any person or class of
> persons of the equal protection of the laws, or of
> equal privileges and immunities under the laws; and 3)
> an act in furtherance of the conspiracy; 4) whereby a

person is either injured in his person or property or
deprived of any right or privilege of a citizen of the
United States.

Dolan v. Connolly, 794 F.3d 290, 296 (2d Cir. 2015) (citation

omitted). "The conspiracy must also be motivated by some racial

or perhaps otherwise class-based, invidious discriminatory

animus." Id. (citation omitted).

Thomsen's conspiracy claims under §§ 1983 and 1985(3) are

dismissed.[6] His allegations of an agreement between the DA

Defendants and the City Defendants to violate his constitutional

rights are conclusory.  Moreover, he has not alleged any

specific facts indicating that the defendants prosecuted him

because of a protected characteristic.  In other words, the

facts in the complaint do not suggest that the prosecution was

motivated by discriminatory animus.

Thomsen's arguments to the contrary are unavailing.  He

argues that the communications between Ferrari and Gomez

constitute an agreement to violate his constitutional rights.

Such a broadly stated rule would cause virtually any

communications between police officers and prosecutors to be a

source of civil liability.  Thomsen further argues that Gomez

and Ferrari acted in concert to conceal exculpatory evidence and

---

[6] These claims may have been abandoned when Thomsen voluntarily
dismissed claims related to violations of the Equal Protection
Clause.

prolong his prosecution.  Absent any facts giving rise to such an inference, Thomsen's conspiracy claims are not plausible and are dismissed.

### D. State Law Claims

Thomsen brought state law claims against Gomez and the DA Defendants for malicious prosecution, intentional infliction of emotional distress ("IIED"), and violations of unspecified rights under the New York State Constitution.  There has been no substantive argument regarding Thomsen's claims under the New York State Constitution, and thus it appears those claims have been abandoned.  As discussed above, the malicious prosecution claim is dismissed because there was probable cause to prosecute Thomsen.

The tort of IIED "provides a remedy for the damages that arise out of a defendant engaging in extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 157 (2d Cir. 2014) (citation omitted)."  In order to prevail, a "plaintiff must establish that there was extreme and outrageous conduct, that the conduct was undertaken with intent to cause, or disregard of a substantial probability of causing, severe emotional distress, and that the conduct did in fact cause severe emotional distress."  Id. at 158 (citation omitted).  This is a "highly

disfavored tort under New York law" that "is to be invoked only
as a last resort." Id. (citation omitted). "The element of
outrageous conduct has been described as rigorous, and difficult
to satisfy." Taggart v. Costabile, 14 N.Y.S.3d 388, 393 (2d
Dep't 2015) (citation omitted). "Liability has been found only
where the conduct has been so outrageous in character, and so
extreme in degree, as to go beyond all possible bounds of
decency, and to be regarded as atrocious, and utterly
intolerable in a civilized community." Id. (citation omitted).
Finally, a claim "may not be sustainable where the conduct
complained of falls well within the ambit of other traditional
tort liability." Turley, 774 F.3d at 159 (citation omitted);
see Salmon v. Blesser, 802 F.3d 249, 256-57 (2d Cir. 2015)
(upholding the dismissal of a claim for IIED where the conduct
was actionable as a battery).

    Thomsen's IIED claim against the DA Defendants and Gomez is
dismissed because the defendants' conduct falls within the
traditional torts of false arrest and malicious prosecution.
Moreover, none of the conduct described in the complaint is
sufficiently outrageous to satisfy the first element of IIED.

    In opposition, Thomsen argues that the torts of false
arrest and malicious prosecution are not the cause of his
emotional distress. Rather, his emotional distress derives from
the alleged due process violation resulting from Gomez's lies to

him about the evidence against him.  This fact, Thomsen argues, places his IIED claim outside the traditional scope of tort liability such that it is actionable.

Even if his IIED claim were indeed based on conduct that was not actionable as a false arrest or malicious prosecution, Thomsen would fail to satisfy the element of "extreme or outrageous" conduct.  The conduct at issue here does not rise to the level of outrageousness that would meet the high standards for such conduct under New York law.  See Taggart, 14 N.Y.S.3d at 394 ("The threshold of outrageousness is so difficult to reach that the Court of Appeals recognized, in 1993, that, of the [IIED] claims that it had considered to that date, every one had failed because the alleged conduct was not sufficiently outrageous." (citation omitted)).

### III. Kefalas

Thomsen brings several state law claims against Kefalas, alleging that she knowingly made false reports of child abuse both to IPS and the NYPD.  In moving to dismiss the complaint, Kefalas argues that she is statutorily immune from Thomsen's suit.  She does not address the merits of Thomsen's individual causes of action.

New York law requires that teachers report instances of suspected child abuse to the authorities when they have "reasonable cause" to believe that such abuse occurred.  N.Y.

Soc. Serv. Law § 413(1)(a).  "[A] qualified privilege protects
certain individuals from civil liability arising from reports of
child abuse that are based on reasonable cause and made in good
faith." G.L. v. Markowitz, 955 N.Y.S.2d 643, 646-47 (2d Dep't
2012) (discussing N.Y. Soc. Serv. Law § 419).  New York law
further provides that a "school official acting in the scope of
his or her employment is presumptively acting in good faith so
long as the person did not engage in willful misconduct or gross
negligence." Villarin v. Rabbi Haskel Lookstein Sch., 942
N.Y.S.2d 67, 71-72 (1st Dep't 2012) (citation omitted).  A
plaintiff may rebut this presumption of good faith with a
showing of bad faith or malice. E.g., Donovan v. City of New
York, 790 N.Y.S.2d 11, 12 (1st Dep't 2005); Escalera v. Favaro,
749 N.Y.S.2d 263, 264 (2d Dep't 2002) ("To rebut the presumption
of good faith, a plaintiff must demonstrate that a defendant was
motivated by actual malice.").

     Thomsen has pled facts that, if true, rebut the statutory
presumption that Kefalas made her reports to IPS and the NYPD in
good faith.  Specifically, the plaintiff alleges that Kefalas
made several false reports against specific teachers at IPS,
including Thomsen's colleagues in his classroom.  Moreover,
Kefalas specifically stated that she disliked Thomsen by saying
"I am against this guy."  According to the complaint, Kefalas
also refused to hand over the video evidence she purported to

have of the abuse, was fired for her refusal, and then made her report to the NYPD in retaliation for the termination of her employment.  The complaint therefore specifically alleges facts that support Thomsen's allegation that Kefalas intentionally and in bad faith filed false reports against him.  These facts are sufficient at this stage to make Thomsen's claim against Kefalas plausible.

Kefalas's arguments to the contrary are not persuasive. Kefalas primarily contends that Thomsen's confessions prove retroactively that Kefalas's reports were reasonable and made in good faith.  This argument ignores the fact that this suit's fundamental premise is that Thomsen's confessions were false. Moreover, Thomsen's confessions cannot retroactively absolve Kefalas of the bad faith and malicious intent with which she allegedly brought her reports to IPS and the NYPD.[7]  Kefalas's policy argument similarly fails.  While it is true that the statutory immunity is meant to encourage reports about child abuse based on reasonable cause, the immunity specifically does not cover willfully malicious or grossly negligent reports of abuse.  Finally, Kefalas cites several cases that she claims stand for the proposition that she had reasonable cause to

---

[7] Kefalas has submitted video clips with her motion which she argues support a finding that she acted in good faith.  Even if it were appropriate to consider these clips on a Rule 12(b)(6) motion, and it is not, they do not assist Kefalas.

report the abuse even though the charges were eventually dropped.  This argument does not overcome the specific facts in Thomsen's complaint that evince Kefalas's bad faith.

### Conclusion

The DA Defendants' September 3, 2015 motion to dismiss is granted.  The City Defendants' September 3, 2015 motion to dismiss is granted in part.  Kefalas's September 3, 2015 motion to dismiss is denied.

Dated:    New York, New York
          February 11, 2016


                              _____
                                   DENISE COTE
                         United States District Judge