USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/26/18_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MALTHE THOMSEN,

              Plaintiff,

    -against-

MARIA ANGELIKI KEFALAS,

              Defendant.

15-CV-2668 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Now before the Court is a motion for summary judgment (Dkt. No. 146) filed by the sole remaining defendant in this action, Maria Angeliki Kefalas. On June 11, 2014, Kefalas called New York's Statewide Central Register (SCR) of Child Abuse and Maltreatment and accused plaintiff Malthe Thomsen of sexually abusing young children at the preschool where he worked as an intern, resulting in his arrest, arraignment, and pretrial incarceration at Rikers Island. After the criminal charges against Thomsen were dropped, he filed this civil suit, including claims for libel, slander, and related torts against Kefalas. In her motion papers, Kefalas argues that as a "mandated reporter" under N.Y. Soc. Serv. Law § 413 she is immune, under § 419 of the same statute, from civil liability resulting from her good-faith report of suspected child abuse. For the reasons that follow, the motion is DENIED.

## I.    BACKGROUND

Plaintiff Thomsen was pursuing a teaching degree when he obtained an internship at the International Preschool (IPS) in Manhattan, where Kefalas worked as an assistant teacher. On May 30, 2014, Kefalas sent an email to an IPS administrator reporting that she had observed plaintiff engage in behavior "which I believe borders inappropriate touching of children." IPS conducted an investigation, during which no other witness corroborated defendant's charges. On

June 5, 2014 – after Kefalas stated that she had evidence of Thomsen's misconduct, but refused to disclose it – IPS terminated her employment. One week later, defendant contacted the SCR, which referred the matter to the New York Police Department (NYPD). Kefalas told the NYPD that Thomsen had repeatedly engaged in inappropriate touching of multiple preschoolers at IPS.

Early on June 27, 2014, NYPD officers woke Thomsen at his apartment. After approximately four hours of unrecorded questioning by Detective Nela Gomez (during which Thomsen waived his *Miranda* rights and executed a written statement), plaintiff acquiesced to a second interview, recorded on videotape, by Assistant District Attorney Rachel Ferrari. The parties dispute whether any of plaintiff's statements can properly be characterized as a confession. It is undisputed, however, that Thomsen was arrested that day, and charged with 15 counts of sexual abuse in the first degree. The case was the subject of extensive media coverage both here and in Europe, and approximately 40 families withdrew their children from IPS.

Thomsen was never indicted by a grand jury. Instead, on November 13, 2014, all charges were dismissed on the motion of the People. This action followed.

### A.    Procedural History

Thomsen filed his initial Complaint on April 6, 2015, naming the City of New York, Police Commissioner William Bratton, Det. Gomez, ADA Ferrari, ADA Nicole Blumberg, and Kefalas as defendants. *See* Compl. (Dkt. No. 1) ¶¶ 1-23. As against the government defendants, plaintiff alleged violations of his rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, malicious prosecution, and intentional infliction of emotional distress. As against Kefalas, he alleged state law claims for libel, slander, injurious falsehood, negligent infliction of emotional distress, negligence, and prima facie tort. *Id.* ¶¶ 146-211. The case was assigned to United States District Judge Denise Cote.

All defendants moved to dismiss the Complaint. (Dkt. Nos. 21, 46, 49.) On July 10, 2015, at an initial conference, Judge Cote granted Thomsen an opportunity to amend his pleading and denied the pending motions to dismiss as moot. (Dkt. No. 45.) On July 31, 2015, Thomsen filed an Amended Complaint (Dkt. No. 58), which dropped Commissioner Bratton as a defendant and omitted several of the constitutional claims originally pled. On September 3, 2015, defendants renewed their motions to dismiss as to all remainining claims. (Dkt. Nos. 65, 69, 73.)

In an Opinion and Order dated February 11, 2016 (Dkt. No. 93), Judge Cote dismissed the case against against ADAs Ferrari and Blumberg, ruling that they were absolutely immune from Thomsen's federal and state law claims. *Thomsen v. City of New York*, 2016 WL 590235, at *4 (S.D.N.Y. Feb. 11, 2016), *appeal withdrawn* (May 23, 2016), *reconsideration denied*, 2016 WL 4507376 (S.D.N.Y. Aug. 26, 2016). She also dismissed all claims against the City and Det. Gomez (collectively the City Defendants) except for plaintiff's claim alleging that any inculpatory statements he made were coerced in violation of his Fifth Amendment right to be free from compulsory self-incrimination. *Id*. at *5-11. The District Judge declined to dismiss the claims against Kefalas, finding that Thomsen had "pled facts that, if true, rebut the statutory presumption that Kefalas made her reports to IPS and the NYPD in good faith." *Id.* at *12. The court specifically noted Thomsen's allegations that Kefalas had made other false reports against IPS teachers, including others in the same classroom; that she stated, "I am against this guy," meaning Thomsen; and that she was fired by IPS after she refused to show administrators the video evidence that she claimed to have showing Thomsen abusing students, arguably providing a motive for her to make a false report "in retaliation for the termination of her employment." *Id.*

On February 25, 2016, the City Defendants moved for reconsideration as to plaintiff's claim against the City for violation of his Fifth Amendment rights (Dkt. No. 97), and on March

16, 2016, in an oral ruling during a scheduling conference, Judge Cote granted that motion (*see* Dkt. No. 106), leaving plaintiff with his Fifth Amendment claim against Det. Gomez and his state law claims against Kefalas. On November 23, 2016, after a settlement conference, plaintiff voluntarily dismissed his remaining claim against Gomez, leaving Kefalas as the sole defendant. (Dkt. No. 138.) On November 30, 2016, Thomsen and Kefalas consented to proceed before the assigned Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c). (Dkt. No. 142.)[1]

### B. The Summary Judgment Motion

On January 12, 2017, Kefalas filed her motion for summary judgment, supported by a memorandum of law (Dkt. No. 149), a Statement of Material Facts pursuant to Local Civil Rule 56.1(a) (Dkt. No. 149-1),[2] and two declarations: one signed by attorney David Wolowitz (Dkt. No. 147), offering his expert opinion as to the proper interpretation and application of the relevant provisions of the Social Services Law; and one signed by attorney Russell Porter (Dkt. No. 148), defendant's counsel of record, annexing what appears to be most if not all of the discovery record amassed in this action, including the plaintiff's written and videotaped statements to the police, the complete transcripts of five depositions, the responses of plaintiff,

---

[1] Because plaintiff is a citizen and resident of Denmark and Kefalas is a resident of New York (*see* Amend. Compl. ¶¶ 12, 23), this Court has subject-matter jurisdiction over the remaining parties and claims based on diversity of citizenship. 28 U.S.C. § 1332(a)(2).

[2] Rule 56.1(a) requires a party moving for summary judgment to submit "a short and concise statement, in numbered paragaphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Rule 56.1(b) requires the opposing party to file a statement "responding to each numbered paragraph in the statement of the moving party." Rule 56.1(b). The opposing party may also include "additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *Id.*

defendant, and Det. Gomez to the written discovery requests served upon them, and the documents they produced. (Dkt. Nos. 148-3 through 148-12.)[3]

On February 3, 2017, in opposition to the motion, plaintiff submitted a memorandum of law (Dkt. No. 150) and a copy of a declaration that Kefalas had previously filed in connection with an earlier motion. (Dkt. No. 150-1.) Notwithstanding the requirements of Local Civil Rule 56.1(b), plaintiff did not respond to defendant's Statement of Material Facts. On February 10, 2017, defendant filed a reply memorandum (Dkt. No. 151) to which she annexed, without any authentication, several additional evidentiary documents, including a portion of her cellphone records for June 11, 2014 (Dkt. No. 151-1), a letter from IPS to Kefalas offering her a "floater" position for the 2014-15 school year (Dkt. No. 151-2); and a copy of what appear to be text messages between defendant and a friend on May 6, 2014. (Dkt. No. 151-3.)

On February 15, 2017, plaintiff sought leave to file a late Local Civil Rule 56.1(b) Statement, which I granted. (Dkt. No. 153.) Plaintiff filed that statement on February 17, 2017 (Dkt. No. 155), together with the declaration of Kaitlin F. Nares, one of his attorneys (Dkt. No. 154), annexing, among other things, CDs containing various audio and video recordings that Kefalas made at IPS. (Dkt. Nos. 154-4 and 154-5.) On February 22, 2017, defendant filed a Reply Statement of Material Facts addressing the portions of plaintiff's statement "with which Ms. Kefalas takes issue." (Dkt. No. 157.)

On February 24, 2017, I heard oral argument on the motion, during which I directed the parties to submit additional briefing regarding two evidentiary questions: (i) the admissibility of the Wolowitz Declaration; and (ii) the relevance, for summary judgment purposes, of evidence

---

[3] At the Court's direction, Porter later refiled some of the same materials in redacted form to avoid disclosure of the names of minor children. (Dkt. Nos. 166, 167, 168.)

post-dating Kefalas's report to the SCR. *See* Tr. of Feb. 24, 2017 Hr'g (Dkt. No. 164) at 37:8-38:18. Those briefs were filed on March 10, 24, and 31, 2017. (Dkt. Nos. 159, 160, 161.) With one exception not relevant here, the parties did not otherwise object to the admissibility of any of the evidentiary materials submitted.

### C.    Facts

The relevant facts are taken from the parties' Local Civil Rule 56.1 Statements and from the underlying evidentiary materials that they submitted, and are undisputed unless otherwise noted.[4] Where the evidence is susceptible of more than one interpretation, I have, as required, "resolv[ed] all ambiguities and draw[n] all factual inferences in favor of the party against whom summary judgment is sought." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### 1.    Plaintiff

Thomsen was a 22-year-old Danish university student, pursuing a teaching degree, when he began a semester-long internship at IPS, a private preschool in New York City, in February 2014. Def. 56.l Stmt. ¶¶ 8, 40; Kane Dep. Tr. (Dkt. Nos. 168-7 and 168-8) at 7:17-25, 18:10-14; Thomsen Dep. Tr. I at 45:14-18.[5] After working briefly in other classrooms, Thomsen requested

---

[4] Both parties had difficulty complying with Rule 56.1. As noted above, plaintiff initially neglected to file the counter-statement required by Rule 56.1(b), and then belatedly sought (and obtained) permission to do so out of time. Moreover, both parties' submissions include many paragraphs of wholly inappropriate legal and factual argument, serving only to burden the Court and delay decision on the motion. *See*, *e.g.*, Def. 56.1 Stmt. ¶¶ 51-57 (presenting extended legal argument as to the proper interpretation and application of the relevant statutory provisions); Pl. 56.1 Stmt. ¶¶ 71, 93 (arguing that "[i]t can be inferred" from the evidence that Kefalas "had clear animus," that her allegations against plaintiff were "false," and that "her true motive was to seek vengeance against co-workers"); Def. Reply 56.1 Stmt. ¶¶ 17, 19, 26, 61-68 (calling plaintiff's contentions "illogical," "self-serving," and "disingenuous").

[5] Thomsen testified for two days, producing two separately-paginated deposition transcripts, referred to here as Thomsen Dep. Tr. I (Dkt. No. 148-6, at ECF pages 1-303) and Thomsen Dep. Tr. II (Dkt. No. 148-6, at ECF pages 304-470).

an assignment to the "Blue Room," where he worked with four- and five-year-old children alongside head teacher Gillian Weitz and two assistant teachers, Sarah Baraie and defendant Kefalas. Def. 56.l Stmt. ¶¶ 10, 46; Thomsen Dep. Tr. I at 83:18-84:9; Baraie Dep. Tr. (Dkt. No. 148-10) at 8:12-9:9, 17:22-24; Kane Dep. Tr. at 9:16-11:8.

### 2. Defendant

Kefalas had been working at IPS since August or September of 2012. Kefalas Dep. Tr. (Dkt. No. 148-7) at 317:25-318:2. During her first year at IPS she worked in the "Yellow Room" with Lisa Goodman and another teacher. *Id*. at 315:9-14. At the end of that school year, she told IPS administrators that she did not want to work with Goodman again, because she "didn't like the way [Goodman] was teaching." *Id*. at 312:6-16. Kefalas thought that Goodman "was not a professional." *Id*. at 312:17-24.

### 3. Defendant's Interactions With Her IPS Colleagues

Kefalas was assigned to the Blue Room in the fall of 2013. Def. 56.1 Stmt. ¶ 47; Baraie Dep. Tr. at 28:17-25. Over the course of the 2013-14 school year, her interactions with her Blue Room colleagues became increasingly fraught. Beginning in October, Kefalas lodged a series of complaints about her fellow teachers, particularly Baraie. Def. Reply 56.1 Stmt. ¶¶ 60, 61-68; *see also* Kefalas Dep. Tr. at 60:14-17 (confirming that the "allegations against Sarah" started in October 2013). Paul Kane, the school's Chief Administrative Officer, recalled that Kefalas "complained that she was being treated unfairly in the team," Kane Dep. Tr. at 84:5-85:3, and that "people mistreated her because she was Greek." *Id*. In addition, Kefalas reported that Baraie "was vocally very loud," *id*. at 89:21-22, that she "like[d] to hit on fathers in the room," and that she "liked to flirt with all of the male administration." *Id*. at 199:3-7. Kefalas also "advised" IPS that Baraie "would come to work at IPS 'hungover.'" Kefalas Interrog. Resp. No. 9 (Dkt. No. 168-3, at ECF pages 30-31).

Asked about these complaints at deposition, Kefalas testified that she simply "told the management of the school" that she didn't consider Baraie's teaching to be "professional." Kefalas Dep. Tr. at 48:6-9; *see also id*. at 49:25-50:5 ("I told them that I didn't think her behavior was very professional"); *id*. at 60:7-9 ("In the beginning, in October, I remember telling the director that Sarah was unprofessional with the children"). *See also* Def. Reply 56.1 Stmt. ¶¶ 61-68 (Kefalas told IPS management about "the many instances of unprofessional behavior exhibited by Ms. Baraie").

Some time in the fall of 2013 Kefalas and Baraie met with CAO Kane to "discuss[ ] if we could work together for the rest of the year." Baraie Dep. Tr. at 32:8-23. According to Baraie, "we all decided we could and then we moved on." *Id*. According to Kefalas, however, she was asked to write "positive things" about Baraie, as "homework," but "didn't do it." Kefalas Dep. Tr. at 386:23-387:25.

Kefalas's November 2013 teacher review noted that she was "defensive in nature," had a "difficult time with criticism," and at times had an "attitude" that created "conflict with other teachers." Ass't Teacher Rev. dated Nov. 4, 2013 (Dkt. No. 168-2, at ECF pages 70-75). Kefalas was given the lowest of three possible ratings ("Needs Improvement") in several areas involving her relationships with other IPS personnel, including, "Assists and Supports the Head Teacher in all aspects of classroom management," "Displays a positive attitude toward co-workers," "Accepts constructive criticism," "Has a good working relationship with team members," and "Responds to head teacher's suggestions in a positive way." In the "comments" section, the

review noted that "[l]ast year, a similar situation occurred with her former team mates." *Id.* at ECF page 73.[6]

Later in the 2013-14 school year, Kefalas escalated her complaints about Baraie, making additional reports to Mona Green, the Location Director responsible for the IPS facility where she worked. Pl. 56.l Stmt. ¶¶ 61-65, 67; Def. Reply 56.1 Stmt. ¶¶ 61-68; *see also* Kefalas Dep. Tr. at 60:18-61:2; 162:13-17. Kefalas objected to Baraie discussing "her personal issues" in front of the childen. *Id.* at 50:6-12. She also accused Baraie of yelling at Kefalas when Kefalas permitted a child to go to the bathroom, *id.* at 53:1-21; "finger-pointing," *id.* at 55:19-56:2; 62:9-21; walking "very heavily with these weird high heels," *id.* at 57:17-22; "flash[ing]" a sorority tattoo that Baraie had on her bicep, *id.* at 63:10-16, 64:15-65:24; and wearing "very short" skirts. *Id.* at 69:16-70:2. In addition, Kefalas "might have mentioned" to Green that Baraie told her not speak to the children's parents because her English was not good enough. *Id.* at 64:4-65:12.

At some point Kefalas made secret audio recordings of Baraie in the classroom. Pl. 56.1 Stmt. ¶ 69; Kefalas Dep. Tr. at 75:4-77:7. She did this because she wanted to show that "certain things [were] happening in the classroom that shoudn't be happening in front of the children." Kefalas Dep. Tr. at 77:5-7.

Kefalas also complained about head teacher Weitz. "I may have said for an exam[ple] that she's crying because she cannot handle the role of the head teacher." Kefalas Dep. Tr. 310:5-12. At deposition, Kefalas described Weitz as incompetent. Pl. 56.1 Stmt. ¶ 73; *see also* Kefalas Dep. Tr. at 266:7-8 (testifying that the head teacher "wasn't even capable of opening a ketchup bottle").

---

[6] At deposition, Kefalas could not recall receiving "this specific form," denied having a meeting in November 2013 to review her job performance, and further denied that she ever did anything to create conflict with other teachers. Kefalas Dep. Tr. at 380:7-24, 388:22-390:12.

In the spring of 2014, Kefalas and Baraie received their contracts for the following school year. Kefalas learned that she was to be a "floater." Baraie Dep. Tr. 35:12-23; Kane Dep. Tr. at 25:6-20; *see also* Def. Reply Mem. Ex. 2 (offer letter dated April 16, 2014). The evidence is mixed as to whether the new assignment was a demotion. *Compare* Kane Dep. Tr. at 25:21-25 ("some people perceive it that way") *and* Baraie Dep. Tr. at 35:12-23 (a floater "is basically a sub") *with* Def. Reply Mem. Ex. 3 (Dkt. No. 151-3, at ECF pages 2-6 ) (Kefalas texts dated May 6, 2014, stating that she got the position she wanted and adding, "if I stayed in blue room . . . With sarah and Gillian I would LEAVE!") (punctuation and capitalization in the original). However, according to Baraie, "[t]hat was when the climate completely changed in our relationship," Baraie Dep. Tr. at 36:18-23, and it became "just near impossible to work with [Kefalas]." *Id.* at 36:25-37:4. It was at this point that Kefalas complained to Green about Baraie's "finger-pointing." *Id.* at 40:13-16. Baraie, in turn, "went to Mona [Green] quite often" regarding Kefalas, "because I really felt we needed a mediator and I didn't feel comfortable being in the room with her." *Id.* at 43:25-44:4. "There was always a conflict, always." *Id.* at 44:6-7.

### 4. Defendant's Observation and Charges

In late May 2014, Kefalas began to observe – and attempt to document – what she characterizes as inappropriate sexual contact between Thomsen and multiple children in the Blue Room. Def. 56.1 Stmt. ¶ 20. It is unclear when Kefalas first focused on this issue – she now states that she first suspected plaintiff of misconduct on or about May 20, *see* Pl. 56.1 Stmt. ¶¶ 20, 84; Kefalas Dep. Tr. at 257:13-20 – but it is undisputed that between May 19 and May 30, 2014, defendant sent her father, Vassilios Kefalas, a series of text messages purporting to report

serious misconduct by several of her fellow teachers, including plaintiff, together with a number of audio and video files. *See* Kefalas Texts (Dkt. No. 168-9), at ECF pages 1-8.[7]

For example, on May 19, 2014, defendant texted "What I see happening are [sic] unheard of." Kefalas Texts at ECF page 2. On May 20, Kefalas sent her father two videos, which she later testified were videos of Thomsen interacting with children in the Blue Room. *Id.*; Kefalas Dep. Tr. at 107:17-108:3. Her father replied, accurately, "It doesn't show anything suspicious." Kefalas Texts at ECF page 2.

On May 22, 2014, during a field trip to the zoo, Kefalas texted that Baraie "acts as if I am trash and the other [Malthe] doesn't hug the kids in front of the parents," adding, "And they think he is sweet." Kefalas Texts at ECF page 3 (brackets in the original). She added that Baraie "is looking at me very hostile." *Id.* An hour later, Kefalas texted: "They belong in prison Sarah and the other [male]," adding, "I mean it," "[a]t least for ten years." *Id.* (initial brackets in the original). Kefalas's last text on May 22 stated that Baraie "is not well I am wondering how she is walking free." *Id.* at ECF page 4. At deposition, asked why Baraie should be "in prison" rather than "walking free," Kefalas explained that her fellow assistant teacher "saw Malthe do something that was inappropriate to the kids." Kefalas Dep. 117:2-10.[8]

On May 28, 2014, Kefalas sent additional video files to her father, asking him to "save them [videos] so that I can erase them to record more," and promising that "[t]omorrow I will

---

[7] Kefalas and her father texted one another in Greek. The English translation produced in discovery, and relied on by both parties in their summary judgment papers, was prepared by defendant and her father. *See* Kefalas Dep. Tr. 94:25-95:21. At oral argument, both parties stipulated to the accuracy of the translation. *See* Tr. of Feb. 24, 2017 Hr'g at 44:14-45:14.

[8] None of Kefalas's May 22 texts asserted that Thomsen was engaging in inappropriate conduct while on the field trip. When asked about this at deposition, Kefalas confirmed that nothing "suspicious" occurred "[w]hile we were at the field trip." Kefalas Dep. Tr. at 110:12-17; *see also id.* at 110:23-111:2 ("no, I don't remember him doing anything while we were there").

take better [videos]." Kefalas Texts at ECF page 4 (brackets in the original). She also provided commentary on some of the videos, for example, "focus on his hands the last minute." *Id*.

On May 29, 2014, Kefalas's first text of the day reported that Baraie "has been looking at me with a lot of hostility like non-stop." Kefalas Texts at ECF page 5. She then announced, "the pervert just entered." *Id*.[9] That same day, IPS Location Director Green visited the Blue Room, where Kefalas was sitting at a table with some of the children. Green told her to "concentrate on this specific table" rather than look around the classroom. Kefalas Dep. Tr. at 150:14-151:3. Kefalas texted her father to inform him that "Mona told me things I don't like." Kefalas Texts at ECF page 5. Kefalas later explained that in her view it was "very wrong" of Green to tell her where to focus. Kefalas Dep. Tr. at 151:12-24. Later that day, Kefalas sent her father another recording and more texts, one reading, "Sarcastic glimpses." Kefalas Texts at ECF pages 5-6.

On the morning of Friday, May 30, 2014, Green informed Kefalas that she was being reassigned to another classroom, leaving Weitz, Baraie, and plaintiff in the Blue Room. Pl. 56.1 Stmt. ¶ 80; Kefalas Dep. Tr. 158:20-22. The reassignment was temporary – Kefalas was back in the Blue Room the following Monday – but she appears to have misunderstood that, at least initially. *See* Kane Dep. Tr. at 24:16-25:1; 45:2-16. At 8:52 a.m. that day, Kefalas texted her father: "so Mona [Green] was accusing me to the other teachers [t]hat I am the problem [a]nd that Sarah and Malthe are a super team? And she took me out? The bitch." Pl. 56.1 Stmt. ¶ 82; Kefalas Texts at ECF page 6.[10]

---

[9] *See also* Kefalas Texts at ECF pages 27, 29 (referring to plaintiff as "the pervert"). Kefalas also referred to Thomsen from time to time as the "fat one." *See id.* at ECF pages 9, 25, 29.

[10] At deposition, Kefalas acknowledged the text and added, "I might have called her a bitch before." Kefalas Dep. Tr. at 164:9-12.

Up until this point, Kefalas had not reported any suspicions concerning plaintiff to anyone else at IPS. Pl. 56.1 Stmt. ¶¶ 87; *see also* Kefalas Dep. Tr. at 257:13-265:8 (explaining that she was "sure that he was doing it" but told no-one at IPS). However, when Mr. Kefalas learned that his daughter had been removed from the Blue Room, he texted her the following advice:

> During your break go to Mona to tell her that you have noticed improper touching of the children in the blue room and you are worried about the welfare of the children and that the school needs to investigate.. Don't tell her about the video.. If she asks tell her that the head teacher and Sarah should have witnessed it but they are not doing anything about it.. Don't say ANYTHING else.. Then Mona will have the responsibility.. When you tell her send me email exactly what you said so that we have evidence..

Kefalas Texts at ECF page 7 (capitalization and punctuation in the original).

Kefalas did not speak to Green during her break. However, that evening, she sent her an email (which her father helped her draft, *see* Kefalas Dep. Tr. at 176:23-25), reading, in full:

> I feel compelled to report that I have observed certain peculiar behavior of Mr. Malthe Arkitekten [sic] lately in the blue room, which I believe borders inappropriate touching of children. In the past, whenever I observed such a behavior I had calmly tried to defuse the situation, by removing the children from the immediate vicinity of Mr. Malthe.
>
> Considering that today you reassigned me to another class and I will no longer be able to observe the behavior and take appropriate action, I [am] now forced to alert you and to ask you to immediately investigate the situation, otherwise, I am advised that I will have to report the incident to the authorities.

Def. 56.1 Stmt. ¶¶ 20-21, 41; Pl. 56.1 Stmt. ¶¶ 58, 81; May 30, 2014 Email from Kefalas to Green (Dkt. No. 148-13). This was the first time defendant reported her allegations concerning plaintiff to anyone at IPS. Pl. 56.1 Stmt. ¶ 81.

### 5. The IPS Investigation

CAO Kane learned about Kefalas's email to Green over the weekend. Def. 56.1 Stmt. ¶ 41; Pl. 56.1 Stmt. ¶ 41; Kane Dep. Tr. at 26:2-27:9. On Monday, June 2, 2014, Kane

interviewed Kefalas in the presence of his supervisor, IPS Director Donna Cohen. Kane Dep. Tr. at 28:3-29:1, 116:4-12. Kefalas told Kane and Cohen that during the zoo trip plaintiff stood behind the children, who were in line, and "rub[bed] their heads against his genitalia." Kane Dep. Tr. at 29:21-30:7; *see also* IPS Invest. Notes (Dkt. No 168-1 at ECF pages 82-88), at ECF page 88. Kane asked Kefalas how that was possible, given that the children were chaperoned by all three classroom teachers as well as parents and guardians, so that "there would have been an adult assigned to each of the children." Kane Dep. Tr. at 30:23-31:15. Kefalas replied that "no one else noticed." *Id*. at 31:17. Kefalas also told Kane that after the field trip the children "all began to play with themselves." *Id*. at 32:2-3.[11]

Kefalas added that while in the classroom plaintiff "would put a Lego into his lap, on top of his pants, and then ask a child to reach and grab that"; that during lunch plaintiff "would take the child's hand while they were eating and rub the spoon, or the hand, against his genitalia"; and that while on the roof playground plaintiff "would seemingly gain pleasure from lifting up a girl onto the playground equipment and reach underneath her dress and touch her buttocks." Kane Dep. Tr. at 35:17-20, 35:25-36:4, 36:8-11. Asked if any of the other teachers noticed this behavior – all of which occurred, by defendant's account, in the presence of multiple adults – Kefalas indicated "that she was the only one who seemed to notice it." *Id*. at 38:11-17. Kefalas did not tell IPS about the videos she had taken. *Id*. at 39:18-21.

As Kefalas had requested in her email, IPS investigated her claims. Def. 56.1 Stmt. ¶ 42; Pl. 56.1 Stmt. ¶ 95; Kane Dep. Tr. at 41:23-42:3. As part of the investigation, on June 3, 2014,

---

[11] This part of Kefalas's report to Kane was inconsistent with her earlier text messages – which do not reflect any inappropriate behavior by Thomsen while at the zoo, *see* Kefalas Texts at ECF pages 3-4 – and with her later deposition testimony, during which she confirmed that nothing "suspicious" occurred "[w]hile we were at the field trip." Kefalas Dep. Tr. at 110:12-17.

IPS staff members with plausible reasons for rotating through the Blue Room – Developmental Specialist Marcia Finkelstein and Location Director Green – were sent in to observe plaintiff's conduct without alerting him to the existence of the investigation. Kane Dep. Tr. at 46:6-48:14. Neither of them reported any inappropriate conduct by plaintiff. Pl. 56.1 Stmt. ¶¶ 100-103; *see also* Kane Dep. Tr. at 48:15-50:9, 53:14-54:24; June 3, 2014 Email from Green to Kane (Dkt. No. 168-1, at ECF page 86) ("He worked with the children all day in a very professional manner"); June 3, 2014 Email from Finkelstein to Kane (Dkt. No. 168-1, at ECF pages 86-87) (noting that during Lego play one child tried to "climb on him" but he "[g]uided her away" and "was gently removing her from this").

Meanwhile, on June 2 and 3, 2014, Kefalas continued texting her father. On June 2 she sent him 51 messages (including 13 audio, video, or image files). Kefalas Texts at ECF pages 9-16. Some of the messages appeared to narrate Thomsen's conduct that day, while others referenced earlier events. At deposition, Kefalas acknowledged, "I might have added stuff that was happening before too." Kefalas Dep. Tr. at 191:24-192:6; *see also id.* at 195:22-23 ("I might have included incidents from previous days too.").

In some of her June 2 messages, Kefalas wrote that Thomsen was touching the children inappropriately (*e.g.*, "He was putting the girls on top of his lap and they were fondling when we had lunch time") or looking at them inappropriately (*e.g.*, "On the roof where the girls are on the bars he is watching them when they open their little legs wearing skirts and he looks at their pipi and their underwear."). Kefalas Texts at ECF page 10. In other messages that day, she accused Baraie and Weitz of intentionally ignoring Thomsen's conduct. *Id.* at ECF page 11 ("Sarah and Gillian are constantly talking and make believe they don't see anything."). In addition, Kefalas

criticized Baraie's interaction with one of the children. *Id*. at ECF page 14 (accusing Baraie of "extorting" the child "psychologically" and making him cry).

Kefalas also complained about her IPS performance review, given to her by Green that morning. *See* Kefalas Dep. Tr. at 206:10-15 (confirming that they "gave me the evaluation" that day); Kefalas Texts at ECF page 16 (telling her father, "these are gross accusations"). The review itself, signed by head teacher Weitz, generally reported that Kefalas met or exceeded expectations in her interaction with the children and their parents, but needed improvement in several areas related to classroom management and professionalism, including, "Accepts constructive criticism" and "Has a good working relationship with team members." Ass't Teacher Rev. dated May 14, 2014 (Dkt. No. 168-2, at ECF pages 64-69). Weitz also commented that there were "some times" when Kefalas "said inappropriate things" to parents. *Id*. at ECF page 68.

On June 3 – the day that IPS placed observers in plaintiff's classroom – Kefalas sent her father another 22 text messages, some of which reported that Thomsen was openly engaging in inappropriate contact even under the eyes of those observers. For example, after noting the presence of Finkelstein (whom she described as "best friends with Lisa [Goodman] . . . and Sarah [Baraie]," Kefalas Texts at ECF page 16), defendant told her father that Thomsen's behavior was "continuing" and that he was "doing it now," even though "[t]he psychologist is looking at him." *Id*. at ECF pages 16-17. *See also id*. at ECF page 18 ("Now he is doing it with [another child]" and "[s]he saw it").[12]

_____

[12] Since then, Kefalas has told several different versions of what she saw (and consequently what the observers could have seen) on June 3, 2014. In her declaration in this action, signed under penalty of perjury on July 9, 2015, Kefalas stated, "Of course, the plaintiff committed no further misconduct in the presence of the two adults." Kefalas Decl. ¶ 20. At her deposition, taken a year later on July 7, 2016, Kefalas testified that when Finkelstein was present Thomsen "would do it

Wednesday, June 4, 2014, was the last day of the 2013-14 school year at IPS. Between 8:30 a.m. and 4:28 p.m. that day, Kefalas sent her father 72 text messages. In some of them she voiced continued hostility towards Baraie, expressing disbelief that Baraie had been invited by some IPS parents to "their summer houses." Kefalas Texts at ECF page 19. In other texts, Kefalas stated that Thomsen was "still doing it and nobody has come to observe." *Id*. Thereafter, Kefalas reported that Thomsen "is putting [a child's] head on his penis and she is jumping on top of him/it," *id*. at ECF page 20; that he "is doing it and he is smiling," *id*. at ECF page 22; and that "[h]e does it with [another child] also." *Id*. At 4:28 p.m. on June 4, 2014, Kefalas texted her father, "FACEBOOK - Guess who deleted me yesterday." *Id*. at ECF page 26.[13] A few messages later, Kefalas referred to Baraie as a "Fucking animal," who "was always jealous of me!" and predicted, "In the end she will have the pervert do me harm." *Id*. at ECF page 27.

At some point on June 4 – after being encouraged several times, via text, by her father – defendant met again with IPS Director Cohen, expressing the view that IPS wasn't "doing enough to address the issue," and that Thomsen should be removed from the classroom immediately. IPS Invest. Notes at ECF page 82; Def. 56.1 Stmt. ¶ 43; *see also* Kane Dep. Tr. at 57:11-20. Cohen "asked Malthe to leave the classroom," but permitted him to "return at dismissal to say goodbye to the parents and the children." IPS Invest. Notes at ECF page 82.

On Thursday, June 5, 2014, Kane formally interviewed (and in some cases re-interviewed) Weitz, Green Baraie, Kefalas, Finkelstein, and the IPS iPad teacher, Eira Toral-Sukhra. Pl. 56.1 Stmt. ¶ 101; *see also* Kane Dep. Tr. at 60:11-83:2; IPS Invest. Notes at ECF

---

very discreetly." Kefalas Dep. Tr. at 215:21-25. "She might have seen it with a sort of – the further end of her eye, but it wasn't that apparent." *Id*. at 216:21-23.

[13] At deposition, Kefalas confirmed that she was referring to Thomsen having "deleted" (de-friended) her on Facebook. Kefalas Dep. Tr. at 242:24-243:22.

pages 81-86. Weitz, Green, Baraie, Finkelstein, and Toral-Sukhra all denied having seen any inappropriate conduct by Thomsen and generally spoke favorably of his teaching skills. Pl. 56.1 Stmt. ¶¶ 101-109; *see also* Kane Dep. Tr. at 61:10-78:15; IPS Invest. Notes at ECF pages 81-86.

Kane interviewed Kefalas twice that day. During the first interview defendant reiterated her previous charges, including that Thomsen hid Lego pieces under his genitalia and then asked a child to take them, and added new allegations, incuding that on June 4 (the previous day), "she saw Malthe touching the girls under their dresses." IPS Invest. Notes at ECF page 84; *see also* Kane Dep. Tr. at 70:21-25. Kefalas also "mentioned other inappropriate touching which she would not describe." IPS Invest. Notes at ECF page 84. Kefalas stated that she had "evidence," but declined to disclose her evidence until she spoke to her lawyer. Def. 56.1 Stmt. ¶ 44; Pl. 56.1 Stmt. ¶¶ 110-11; *see also* Kane Dep. Tr. at 68:1-69:6, 71:23-72:10; IPS Invest. Notes at ECF pages 83-84.

During the second interview, Kane again asked Kefalas for her evidence concerning Thomsen – stressing that it was "important" to share any such evidence since the school had been "unable to corroborate any of these allegations." Kane Dep. Tr. at 79:25-81:12. In addition, Kane advised defendant that "not giving me the evidence would be insubordination," but defendant remained "unwilling to show whatever she had." *Id*. at 81:16-21. Kefalas then backtracked, stating that her evidence was her description of plaintiff's conduct, and explained that she was "not against the school, she was against this guy." *Id*. at 81:22-82:9; *see also* IPS Invest. Notes at ECF page 85.[14]

---

[14] Kefalas has provided several different accounts of her June 5 meetings with Kane, including several different versions of the reasons she gave him for not letting him view the videos she took in the Blue Room. *See* Kefalas Decl. ¶ 21 ("I informed him that it was not on my person at that time."); July 11, 2014 Email from Kefalas to Det. Gomez ("I said [the] evidence was what I

After a further warning, and a further refusal, Kane terminated defendant's employment. Def. 56.1 Stmt. ¶ 44; Pl. 56.1 Stmt. ¶¶ 111-13; *see also* Kane Dep. Tr. at 82:10-16; IPS Invest. Notes at ECF page 85; Kefalas Texts at ECF page 31; Kefalas Decl. ¶¶ 21-22; July 11, 2014 Email from Kefalas to Det. Gomez; Kefalas Interrog. Resp. No. 12.[15]

### 6.    Defendant's Videos

The evidence that Kefalas declined to share with IPS (although she had it on her cellphone the day she was terminated, *see* Kefalas Dep. Tr. at 294:22-295:7) included multiple short videos taken in the Blue Room, using that cellphone, between May 20, 2014 and June 2, 2014. The summary judgment record includes two videos from May 20, four from May 28, and eight from June 2, 2014, most of them showing Thomsen interacting unremarkably with small children. (Dkt. No. 154-4.) At deposition, Kefalas testified that she wanted to "show that the way he was handling the kids was not appropriate," Kefalas Dep. Tr. at 131:14-16, but struggled when asked to point out any improper conduct captured on the videos. *See, e.g.*, *id*. at 280:5-9 ("I saw the hand of the child sort of approaching his – his genitalia, touching his genitalia area, but you couldn't see [in] the video, because I was moving my leg."); *id*. at 280:23-281:2 ("Because I was sitting in the chair, it was very difficult for me to tape it, so you can't really see there, but that's what was happening."); *id*. at 281:9-10 ("I wasn't able to capture it."); *id*. at 283:11-14 ("He would do it in a much worse scale, but this is just the only

witnessed . . . and any other evidence I may have I will send you with my lawyer."); Kefalas Dep. Tr. at 294:22-25 ("I said, 'I don't have it on me,' and I said, 'I have it in my phone.'").

[15] At various places in their summary judgment papers the parties have suggested that these meetings occurred, and that Kefalas was terminated, on Wednesday, June 4, 2014. *See, e.g.*, Def. 56.1 Stmt. ¶ 24; Pl. 56.1 Stmt. ¶ 51. However, the underlying testimony and documents, including Kane's deposition testimony, the IPS investigation notes, Kefalas's contemporaneous text messages, her own declaration, and her July 11, 2014 email to Det. Gomez (reading, "Yes I am sure I was fired on June 5th 2014"), all show that the interviews took place, and defendant's employment was terminated, on Thursday, June 5, 2014.

time I could capture a moment that is indicative of what was happening."); *id*. at 286:3-4 ("I

don't think you can clearly see it in the video."); *id*. at 287:5 ("You can't see it clearly, no.").

### 7. Defendant Calls the SCR

While working at IPS, Kefalas had received and read a copy of the school's handbook,

which informed her that school employees were "mandated reporters" who must report suspected

child abuse or maltreatment to the SCR, and provided a 1-800 number for that purpose. Pl. 56.1

Stmt. ¶ 83; Kefalas Dep. Tr. at 370:9-372:19; Kefalas Decl. ¶¶ 6-8. In addition, she took a two-

hour mandated reporter training class. Kefalas Dep. Tr. at 369:1-370:8.

Kefalas first called the SCR on June 11, 2014, one week after her employment was

terminated. Def. 56.1 Stmt. ¶ 25.[16] That same day, NYPD Detective Gomez was assigned to

investigate defendant's accusations against Thomsen. *Id.* ¶ 27; *see also* Gomez Dep. Tr. (Dkt.

No. 148-8) at 8:17-9:9. Gomez first interviewed Kefelas on June 12, 2014. Def. 56.1 Stmt. ¶ 28;

*see also* Gomez Dep. Tr. at 8:19-21. Kefalas was accompanied by her father and her attorney. *Id.*

at 15:25-16:19. Kefalas "generally restated what she had told IPS regarding the inappropriate

behavior she observed Malthe Thomsen engage in." Kefalas Interrog. Resp. No. 13; *see also*

Def. 56.1 Stmt. ¶ 28.[17]

---

[16] Defendant testified that she was not sure what number she called, or when. Kefalas Dep. Tr. at 372:14-373:18. However, assuming that her cellphone records (Dkt. No. 151-1) can be adequately authenticated at trial, they will confirm that she called the SCR on June 11, 2014. Similarly, the NYPD records produced by Det. Gomez reflect that the "source" (Kefalas) contacted the "child abuse hotline" on June 11, 2014. *See* Law Enforcement Referral (Dkt. No. 148-5, at ECF pages 217-18). I therefore conclude that there is no genuine dispute as to whether and when Kefalas called the SCR.

[17] According to Det. Gomez's typed interview notes, Kefalas reported that she saw plaintiff "grab children [sic] hands and make the children touch his genitals," "place toys under his gen[itals] over his clothes so the children would touch his genitals as they were trying to grab the toys," "grab childrens [sic] buttocks as he would carry them down from the monkey bars," and "dry hump other children where the childs [sic] face would be facing Mr. Malthe [sic] groin and dry hump towards the children [sic] face." (Dkt. No. 148-5, at ECF page 40.)

Kefalas also told Gomez that she had documented her observations with video recordings, and provided Gomez with a copy of "one or two" recordings. Gomez Dep. Tr. at 23:22-24:15, 26:5-27:4. According to Gomez, the videos themselves were "of no investigatory value." *Id*. at 27:21-28:4; *see also id*. at 35:8-11 ("there was really nothing on the video that would be helpful").[18] However, Gomez believed Kefalas, *see id.* at 106:25-107:3, and, after discussing the matter with her supervisors, decided to interview Thomsen next. *Id*. at 124:20-125:19; *see also* Pl. 56.1 Stmt. ¶ 123.

### 8. The Criminal Investigation and Prosecution

Early in the morning on June 27, 2014, Gomez and another police officer came to plaintiff's home. Def. 56.l Stmt. ¶ 13. Thomsen agreed to accompany them to a nearby police station, *id.*, where he was read, and waived, his *Miranda* rights. *Id.* ¶¶ 14-15. He was then questioned by Gomez for approximately four hours. *Id.* ¶ 18.

The interview was not recorded, and the parties vigorously dispute what Thomsen was told as well as what he said. According to plaintiff, Gomez (i) falsely informed him that there were videos showing him engaged in the specific conduct alleged by Kefalas, *see* Thomsen Dep. Tr. I at 204:3-7; Thomsen Dep. II at 89:19-23; (ii) suggested that he might have engaged in that conduct "without knowing it," *see* Thomsen Dep. Tr. I at 181:16-19; and (iii) relentlessly pressured him to confess even though he could not recall committing any abuse.[19] According to

---

[18] The undersigned Magistrate Judge concurs, as did the District Judge. *See Thomsen*, 2016 WL 590235, at *13 n.7 (the videos "do not assist Kefalas").

[19] Thomsen testified that when he asked to see the videos, Gomez said they were not available, "and that either way, it wasn't relevant at that time because I knew what was on them." Thomsen Dep. Tr. I at 204:7-14; *accord* Thomsen Dep. Tr. II at 108:5-9. It did not occur to Thomsen that a police officer might misrepresent the existence or contents of evidence. *See* Thomsen Dep. Tr. I at 204:15-24 (upon learning about the videos "my head like exploded" because "I believed in the authority of the police and . . . she was a Special Victims Unit officer who had expertise in this sort of thing," ); *id*. at 205:1-6 (Thomsen did not know "why she would [lie] about something

Gomez, she told Thomsen that she had seen the videos, but did not tell him that they were inculpatory or engage in any "trickery" about "evidence that doesn't really exist." Gomez Dep. Tr. at 189:11-190:10.[20] Moreover, Gomez testified, by the end of the interview Thomsen clearly admitted – three times – that he "grabbed the children's hands, put them up his genitals [sic] to touch him," and that "it felt good." *Id*. at 217:7-23.

Thereafter, Thomsen executed what Kefalas characterizes as a "written confession." Def. 56.1 Stmt. ¶ 32. In the document itself (Dkt. No. 148-11), plaintiff stated that he "had a rude awakening" that morning when he "realized" that he "had taken a kids [sic] hand to the genital area of my shorts, and taken something good from it." Plaintiff wrote that he was "horrified by this," because he "didn't think this was a part of me," but was glad it was "found out this early" and wanted to "deal with this part of me" and "do whatever necessary." *Id*.

Thomsen was then taken to the District Attorney's office, where ADA Ferrari conducted a video-recorded interview in which she confirmed the authenticity of his written statement, obtained some background information, then asked "what happened?" Video Interview (Dkt. No. 154-3) at 12:50:07-13:01:57. Thomsen responded by stating that Kefalas had "presented a video, and so I had taken kids' hands during play time and placing it [sic] around my genital area and my shorts." *Id*. at 13:02:00-13:02:33. He denied having any sexual thoughts about children, "but of course being presented with this today I realized that it was something I did and it's like, it's

___

like that," but "at the same time, I couldn't remember having done anything like that."). He began to doubt his own memory. *See* Thomsen Dep. Tr. II at 104:8-10 ("I couldn't remember having done it, but if it's on video, then it would have to be true."). As the questioning wore on, he "probably ended up believing her to some degree." *Id*. at 109:1-6. Asked directly about the same allegations at deposition, Thomsen denied engaging in any of the misconduct that Kefalas reported. *See* Thomsen Dep. Tr. II at 7:15-8:11, 73:17-74:14.

[20] Gomez also denied bringing up or discussing the idea that Thomsen might have engaged in abusive behavior without being aware of it. Gomez Dep. Tr. at 187:7-16.

really hard to take in." *Id.* at 13:03:30-13:03:51. Asked to confirm details of the charges, Thomsen could not do so.[21] Asked whether he had ever touched a child inappropriately, Thomsen replied that he "was told" that he had done so. *Id.* at 13:05:54-13:07:02, 13:39:05-13:39:40.

At the conclusion of the videotaped interview, plaintiff was arrested. Def. 56.1 Stmt. ¶ 34. Neither party suggests that there was any basis for that arrest beyond Kefalas's statements and his own.[22] Plaintiff was charged with 15 counts of sexual abuse in the first degree in violation of N.Y. Penal L. § 130.65(3). *See* Criminal Complaint (Dkt. No. 148-5, at ECF pages 229-30). The case was widely covered in the press.[23] Approximately 40 children were withdrawn from IPS when the story broke. Kane Dep. Tr. at 203:13-19. Some of the children later re-enrolled. *Id.*

Meanwhile, the NYPD and the District Attorney continued their investigation. Law enforcement personnel searched Thomsen's phone and computer, interviewed various IPS personnel, and conducted forensic interviews of a dozen children who had been in the Blue

---

[21] For example, Thomsen could not say when the misconduct started, Video Interview at 13:20:03-13:20:37, or how often it occurred. *Id.* at 13:20:38-13:22:30. Nor could he identify any specific child with whom he engaged in any inappropriate conduct, even after discussing each child in the Blue Room with ADA Ferrari. *See id.* at 13:23:25-13:29:00.

[22] The NYPD did not speak to any of the IPS witnesses who were present when the alleged abuse took place, nor to any of the children in the Blue Room, until after Thomsen was arrested. Pl. 56.1 Stmt. ¶ 123; Gomez Dep. Tr. at 81:5-83:16, 124:20-125:19.

[23] *See, e.g.*, Colin Moynihan and Joseph Goldstein, *Preschool Intern Accused of Sex Abuse Can Be Kept in Jail*, N.Y. Times, July 3, 2014, https://www.nytimes.com/2014/07/04/nyregion/preschool-intern-accused-of-sex-abuse-can-be-kept-in-jail-judge-says.html; Alex Greig, *Danish intern, 22, jailed for allegedly sexually abusing 13 children at Manhattan preschool*, Daily Mail, July 4, 2014, http://www.dailymail.co.uk/news/article-2680736/Manhattan-preschool-intern-jailed-allegedly-sexually-abusing-13-children.html; *22-årig dansker fængslet i New York*, Politiken, July 5, 2014, http://politiken.dk/udland/art5524559/22-årig-dansker-fængslet-i-New-York; Adam K. Raymond, Posh Manhattan Preschool Shaken Up by Messy Sex Abuse Allegations, N.Y. Magazine, July 23, 2014, http://nymag.com/daily/intelligencer/2014/07/posh-nyc-preschool-shaken-up-by-sex-abuse-claims.html (all last visited March 26, 2018).

Room with Thomsen. *See* Informational Reports dated June 28-July 2, 2014 (Dkt. No. 148-5, at ECF pages 77-101). On September 18, 2014, the People moved to lower Thomsen's bail, reporting concerns about the government's ability to produce "competent reliable evidence" corroborating Thomsen's statements. Pl. 56.1 Stmt. ¶ 127; *see also* Tr. of Sept. 18, 2014 Crim. Ct. Hr'g (Dkt. No. 58-5), at 2-3. On November 13, 2014, the People moved to dismiss all of the charges against Thomsen. Pl. 56.1 Stmt. ¶ 128. ADA Ferrari explained that after "a careful and thorough evaluation of the evidence gathered in our extensive investigation, we have determined that we cannot prove this case beyond a reasonable doubt." Tr. of Nov. 13, 2014 Crim. Ct. Hr'g (Dkt. No. 58-6) at 2.

## II.     LEGAL STANDARDS

### A.     Summary Judgment

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128-29 (2d Cir. 1996). The party moving for summary judgment bears the burden of showing the absence of any genuine dispute of material fact by citing to admissible evidence in the record. Fed. R. Civ. P. 56(a), (c); *Adickes v. S.H Kress & Co.*, 398 U.S. 144, 157 (1970).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to establish a genuine dispute of fact. *Beard v. Banks,* 548 U.S. 521, 529 (2006); *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir. 2001). The non-moving party may not avoid summary judgment by "relying solely on conclusory allegations or denials that are unsupported by facts." *Garcia v. Jon.Jon Deli Grocery Corp.*, 2015 WL 4940107, at *2 (S.D.N.Y. Aug. 11, 2015) (citing *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002)).

24

Instead, the non-moving party "must set forth 'specific facts showing that there is a genuine issue for trial.'" *Garcia*, 2015 WL 4940107, at *2 (quoting *Celotex Corp.*, 477 U.S. at 324).

When considering a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Thus, "the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. The inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin*, 46 F.3d at 202 (citations omitted).

At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The trial court's responsibility is 'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.'" *Cornigans v. Mark Country Day Sch.*, 2006 WL 3950335, at *3 (E.D.N.Y. July 12, 2006) (quoting *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 522 (2d Cir. 1996)), *report and recommendation modified on other grounds, J.C. v. Mark Country Day Sch.*, 2007 WL 201163 (E.D.N.Y. Jan. 23, 2007). In other words, the court need only "determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Shapiro v. Kronfeld*, 2004 WL 2698889, at *8 (S.D.N.Y. Nov. 24, 2004) (quoting *Anderson*, 477 U.S. at 251-52). "[S]ummary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, 'there can be but one reasonable conclusion as to the

verdict.'" *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 250). *See also Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (quoting *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009)) ("[s]ummary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit").

"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). *See also* Local Civ. R. 56.1(d) (each statement by a party of a fact as to which that party contends that there is, or is not, a genuine issue to be tried must be followed by a citation to evidence "which would be admissible," as required by Fed. R. Civ. P. 56(c)). However, "documents inadmissible under the evidence rules may be considered by the court if not challenged." 10A Wright, Miller, & Kane, *Federal Practice & Procedure* § 2722, at 400 (4th ed.); *accord Capobianco v. City of New York*, 422 F.3d 47, 55-56 (2d Cir. 2005) (where "unsworn letters" were submitted by defendants as part of their summary judgment moving papers, defendants "waived any objections" to their admissibility, thus permitting plaintiff to rely on them in opposition to the motion); *accord A.A.B. Joint Venture v. United States*, 77 Fed. Cl. 702, 706 (2007); *Jackson v. City of New York*, 2011 WL 1533471, at *9 (E.D.N.Y. Mar. 3, 2011), *report and recommendation adopted sub nom. Jackson v. New York*, 2011 WL 1527935 (E.D.N.Y. Apr. 22, 2011); *Watson v. Long Island R.R. Co.*, 500 F. Supp. 2d 266, 269 n.5 (S.D.N.Y. 2007).

Here, because subject-matter jurisdiction is based on diversity of citizenship and plaintff's claims all arise under state law, the Court applies the substantive law of the State of New York. *See, e.g.*, *Burt Rigid Box, Inc.*, 302 F. 3d at 91.

### B. New York Social Services Law

#### 1. Reasonable Cause

Article 6, Title VI of the New York Social Services Law, first enacted in 1973 as the Child Protective Services Act (the Act), L.1973, ch. 1039, § 1, 1973 N.Y. Laws 2909, was designed "to encourage more complete reporting of suspected child abuse and maltreatment." N.Y. Soc. Serv. Law § 411. In its current form, the Act requires teachers, school administrators, and other school officials to "report or cause a report to be made" whenever they "have reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or mistreated child." *Id*. § 413(1)(a). Reports of "suspected child abuse" under the statute must be made "immediately," either by telephone or by facsimile. *Id*. § 415. Oral reports must be made to the SCR, "unless the appropriate local plan for the provision of child protective services provides that oral reports should be made to the local child protective service," and must be followed by a written report within 48 hours. *Id*.[24]

Mandated reporters "need not await conclusive evidence of abuse or maltreatment but must act on their reasonable suspicions." *Rine v. Chase*, 309 A.D.2d 796, 798, 765 N.Y.S.2d 648, 650 (2d Dep't 2003) (quoting *Isabelle V. v. City of New York,* 150 A.D.2d 312, 313, 541 N.Y.S.2d 809, 810 (1989)); *see also Kempster v. Child Prot. Servs. of Dep't of Soc. Servs. of Suffolk Cty.*, 130 A.D.2d 623, 625, 515 N.Y.S.2d 807, 809 (2d Dep't 1987) (reporting requirement is predicated upon "reasonable cause to suspect that the infant might have been abused," not "actual or conclusive proof").

---

[24] In New York City, oral reports are made by calling the SCR. *See* Mandated Reporters, New York City Administration for Children's Services, https://www1.nyc.gov/site/acs/child-welfare/mandated-reporters.page (last visited March 26, 2018).

Mandated reporters who "willfully" fail to report suspected child abuse may be charged with a Class A misdemeanor. N.Y. Soc. Serv. Law § 420(1). In addition, mandated reporters who "knowingly and willfully" fail to report suspected child abuse may be subject to civil liability for any damages proximately caused by their inaction. *Id*. § 420(2).

### 2. Presumption of Good Faith

"The state's interest in encouraging teachers to protect students is . . . powerful." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 273 (2d Cir. 2011); *see also Satler v. Larsen,* 131 A.D.2d 125, 129, 520 N.Y.S.2d 378, 382 (1st Dep't 1987) ("The importance of rapidly detecting and addressing instances of an evil as pernicious as child abuse cannot be overstated."). To that end, the Act provides qualified immunity to mandated reporters from "any liability, civil or criminal," that might otherwise result from the reporter's participation "in good faith" in "the making of a report" pursuant to the statute. N.Y. Soc. Serv. Law § 419. The good faith of a mandated reporter "shall be presumed," *id*., provided that (a) the report was made in "discharge of [the reporter's] duties and within the scope of [her] employment," and (b) any resultant liability (from the report) did not "result from the willful misconduct or gross negligence" of the reporter. *Id*.

### 3. Standard for Reasonable Cause

The "reasonable cause" language of § 413(1)(a), which creates the duty to report suspected child abuse, does not reappear in § 419, which establishes qualified immunity for reports made in good faith. However, the New York courts, to which this Court must defer when interpreting a New York statute, *see United States v. Fernandez-Antonia*, 278 F.3d 150, 162 (2d Cir. 2002), have consistently held that statutory immunity "attaches" only where both standards are met; that is, "where there is reasonable cause to suspect that the child might have been abused, *and* where the reporting party has acted in good faith." *Goldberg v. Edison*, 41 A.D.3d

428, 428, 838 N.Y.S.2d 145, 146 (2d Dep't 2007) (*Goldberg I*) (emphasis added); *accord Biondo v. Ossining Union Free Sch. Dist.*, 66 A.D.3d 725, 727, 888 N.Y.S.2d 75, 77 (2d Dep't 2009); *Lentini v. Page*, 5 A.D.3d 914, 915-16, 773 N.Y.S.2d 472, 474 (3d Dep't 2004); *Rine*, 309 A.D.2d at 797, 765 N.Y.S.2d at 650; *Kempster*, 130 A.D.2d at 625, 515 N.Y.S.2d at 809. Thus, in *Vacchio v. St. Paul's United Methodist Nursery Sch.*, 1995 WL 17959412 (N.Y. Supr. Ct. N.Y. Co. Aug. 18, 1995), where a nursery school teacher made a report of suspected child abuse after observing a child's black eye – without any further investigation – the court expressly relied on the "reasonable cause" standard in refusing to dismiss the subsequent suit by the child's parents. 1995 WL 17959412, at *4 (noting that "[t]he concepts of 'reasonable suspicion' and 'reasonable cause' from which the immunity springs are inextricably interwoven with the concept of 'gross negligence' which serves both to rebut the presumption of good faith and to remove the foundational underpinnings on which the immunity is grounded"). *See also Biondo*, 66 A.D.3d at 727, 888 N.Y.S.2d at 77 (affirming denial of summary judgment where there were "triable issues of fact as to whether the defendant school district employees had reasonable cause to suspect possible child abuse" by the plaintiff).

Whether reasonable cause exists to suspect child abuse is an objective question that must be answered in light of the information available to the reporter at the time of her report. *See, e.g.*, *Rine*, 309 A.D.2d at 797-98, 765 N.Y.S.2d at 650 (granting summary judgment in favor of defendant reporter where she "submitted evidence establishing that the children made statements to her during therapy sessions which provided her with reasonable cause to suspect that they had been abused by the plaintiff" *and* demonstrated "that she acted in good faith in reporting her suspicions"); *Satler*, 131 A.D.2d at 131, 520 N.Y.S.2d at 382 (dismissing claims on summary judgment where "there was ample basis for the report"); *Kempster*, 130 A.D.2d at 625-26, 515

N.Y.S.2d at 809-810 (finding that appellant "had reasonable cause to suspect a possible case of child abuse" based on "the medical data and other available information" when the report was made); *see also Shapiro*, 2004 WL 2698889, at *19 (citing § 419 and holding, in federal civil rights action, that school social worker and principal were entitled to qualified immunity because "it was objectively reasonable" for them to "report to the SCR their suspicions concerning possible abuse or neglect based on what [the child] had reported to them"); *Carossia v. City of New York*, 39 A.D.3d 429, 430, 835 N.Y.S.2d 102 (2d Dep't 2007) (granting motion for directed verdict to defendants where mandated reporter had "reasonable cause to suspect the child might have been abused" after being presented with "serious allegations of child sexual abuse" that were "seemingly" confirmed by the child).[25]

As noted above, "reasonable cause" does not require "conclusive evidence," *Rine,* 309 A.D.2d at 798, 765 N.Y.S.2d at 650, or indeed any other particular type or quantity of evidence. However, "[t]he requisite knowledge must be more than subjective; it should have at least some

---

[25] In her moving brief, defendant Kefalas points out, correctly, that § 413(1)(c) of the Act, which protects employees from "retaliatory personnel action" for making mandated reports, states that no such retaliatory action may be taken against an employee "because such employee *believes* that he or she has reasonable cause to suspect that a child is an abused or maltreated child and that employee therefore makes a report in accordance with this title." (Emphasis added.) From this, she infers that "the reasonable cause standard is a subjective one which focuses on the *mens rea* of the reporter." Def. Mem. at 5; *see also* Tr. of Feb. 24, 2017 Hr'g at 11:5-12:11 (conceding that "an objective standard is used" to determine whether a mandated reporter is liable for failing to make a report, but arguing that "with regard to retaliation by an employer *or with regard to whether statutory immunity attaches*, it's actually the subjective mindset of the reporter" that controls) (emphasis added). Counsel is correct as to retaliation, which is governed by the very specific language of subsection (1)(c), but not as to statutory immunity, which is governed by the more general "reasonable cause" language of subsection (a)(1) and by New York case law, which consistently looks to objective evidence to determine when immunity "attaches," and which this Court is not free to disregard. *See Fernandez-Antonia*, 278 F.3d at 162 (The federal courts, when interpreting a New York statute, are "guided not only by the language of the statute itself but also by New York courts' interpretation of the statute.").

demonstrable roots." *Vacchio*, 1995 WL 17959412, at *3 "Mere 'hunch' or 'gut reaction' will not do." *Id.* (quoting *People v. Sobotker*, 43 N.Y.2d 559, 564, 402 N.Y.S.2d 993, 996 (1978)).

### 4.      Standard for Rebutting Presumption of Good Faith

Long before the Act became law in 1973, the New York courts recognized, as a matter of common law, that where a defendant is entitled to qualified immunity arising from statements made pursuant to a statutory obligation, the plaintiff may rebut that presumption by showing both the falsity of the statements and "actual malice or ill will" on the part of the defendant. *See, e.g.*, *Shapiro v. Health Ins. Plan of Greater New York*, 7 N.Y.2d 56, 61, 163 N.E.2d 333, 336 (1959) ("When defendant's statements are presumptively privileged the rule is that, in order to render them actionable, it is incumbent on the plaintiff to prove that [they were] false and that the defendant was actuated by express malice or actual ill-will.") (internal quotation marks omitted).

Although § 419 states on its face that either "willful misconduct" or "gross negligence" will defeat the presumption of good faith, many New York courts continue to apply the older common-law formulation to cases arising under that provision. *See, e.g.*, *Miller v. Beck*, 82 A.D.2d 912, 913, 440 N.Y.S.2d 691, 691-92 (2d Dep't 1981) (citing *Shapiro*, 7 N.Y.2d at 61) ("Where, as here, a defendant's statements are presumptively privileged, either by statutory mandate or at common law, they are actionable only if the plaintiff can prove their falsehood and that the defendant was motivated by actual malice or ill will."); *accord Satler*, 131 A.D.2d at 130-31, 520 N.Y.S.2d at 382 (at summary judgment, plaintiff was required "to produce evidence sufficient to raise a triable issue of fact as to whether defendant acted out of actual malice"); *Zornberg v. N. Shore Univ. Hosp.*, 29 A.D.3d 986, 815 N.Y.S.2d 719, 720 (2006) ("Although the defendants are entitled to immunity from liability based upon the good-faith making of a report of suspected child abuse, and the good faith of any person required to report cases of suspected child abuse shall be presumed, the complaint alleged facts sufficient to support a claim of actual

malice.") (internal citations omitted); *see also Stratakis v. Ferncliff Manor Home for the Handicapped*, 308 A.D.2d 397, 398, 764 N.Y.S.2d 431, 432 (1st Dep't 2003) (denying summary judgment where the "strained relationship" and "verbal confrontations" between plaintiff and defendant suggested that defendant's report may have been retaliatory).

Other cases recite both the statutory language ("willful misconduct or gross negligence") and the common-law standard ("actual malice or ill-will"), treating them as alternative methods of rebutting the presumption of good faith. *E.g.*, *Rine*, 309 A.D.2d at 798, 765 N.Y.S.2d at 650 (granting summary judgment to defendant where plaintiff's evidence "was insufficient to raise a triable issue of fact as to whether the defendant engaged in misconduct or gross negligence" *and* she "failed to come forward with evidence raising an issue of fact as to whether the defendant acted with actual malice"); *Hachmann v. Cty. of Nassau*, 29 A.D.3d 952, 952-53, 818 N.Y.S.2d 102, 103-104 (2006) (noting school officials are generally entitled to immunity for reports absent "willful misconduct or gross negligence" but denying summary judgment to defendant where plaintiff demonstrated "an issue of fact as to actual malice"); *Goldberg v. Edson*, 41 A.D.3d 429, 429-30, 837 N.Y.S.2d 326, 326-27 (2d Dep't 2007) (*Goldberg II*) (finding that there was "no evidence" that physician who participated in a child abuse investigation was "guilty of willful misconduct or gross negligence so as to overcome the statutory presumption of good faith," and also noting there was "no evidence that [physician] acted with any malice toward the mother or any other member of the child's family").

In addition – and not surprisingly – a number of cases focus exclusively on the standard set out in the statute itself. *See, e.g.*, *Lillian C. v. Admin. for Children's Servs.*, 48 A.D.3d 316, 316-17, 852 N.Y.S.2d 86, 87 (1st Dep't 2008) (holding that defendants were entitled to summary judgment because "[t]he record contains no evidence of willful misconduct or gross negligence,

which is required to overcome the statutory presumption"); *Ervin v. Bronx Lebanon Hosp. Ctr*., 17 A.D.3d 301, 302, 794 N.Y.S.2d 41, 41 (1st Dep't 2005) (affirming summary judgment where "[n]o triable issue was raised as to whether defendants . . . engaged in willful misconduct or were grossly negligent in making the disputed report of child abuse"). In *Vacchio*, for example, the court applied the "willful misconduct or gross negligence" standard, and denied summary judgment, 1995 WL 17959412, at *2, without ever mentioning "malice" or "ill will."

"Willful misconduct occurs when a person intentionally acts or fails to act knowing that (his, her) conduct will probably result in injury or damage." N.Y. Prac. Com. Litig. § 88:92 (4th ed.); *see also Seminara v. Highland Lake Bible Conference, Inc.*, 112 A.D.2d 630, 633, 492 N.Y.S.2d 146, 148 (3d Dep't 1985) ("Intentional acts of unreasonable character, performed in disregard of a known or obvious risk so great as to make it highly probable that harm will result, are considered willful conduct in the realm of tort law.") (citing W. Prosser & W. Keeton, The Law of Torts § 34, at 213 (5th ed. 1984)).

"Gross negligence," in New York, "betokens a reckless indifference to the rights of others." *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385, 448 N.E.2d 413, 417 (1983); *see also Cornejo v. Bell*, 2008 WL 5743934, at *19 (E.D.N.Y. May 19, 2008) (quoting *Mosher-Simons v. Cty. of Allegany,* 1997 WL 662512, at *6 (W.D.N.Y. Sept. 30, 1997) ("Gross negligence is defined as 'an aggravated disregard for the rights and safety of others.'"); *Shapiro*, 2004 WL 2698889, at *23 (gross negligence "requires a showing of deliberate indifference or reckless disregard"); *Vacchio*, 1995 WL 17959412, at *4 (quoting *Colnaghi U.S.A., Ltd. v. Jewelers Prot. Servs, Ltd*., 81 N.Y.2d 821, 823-24, 595 N.Y.S.2d 381, 383 (1993)) (gross negligence is "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing") (internal citation omitted). In declining to dismiss claims against a

nursery school teacher and the school, the *Vacchio* court reasoned that the teacher's failure to conduct even a "preliminary inquiry or investigation" into a child's black eye before calling the SCR "may support a finding of gross negligence." 1995 WL 17959412, at *4.

It is clear, however, that immunity attaches even where reports of abuse are "ultimately determined to be unfounded." *Rine,* 309 A.D.2d at 798, 765 N.Y.S.2d at 650. Thus, evidence that the report was unfounded, *i.e.*, that no abuse actually occurred, does not – standing alone – undercut the existence of "reasonable cause," nor rebut the presumption of good faith. *Mark Country Day Sch.*, 2007 WL 201163, at *7 ("[T]he issue is not whether there is ultimately a finding of abuse or not . . . but rather whether plaintiffs have rebutted the presumption of good faith.") (internal quotations omitted); *Rine,* 309 A.D.2d at 798, 765 N.Y.S.2d at 650 (granting summary judgment to defendants where report, although "determined to be unfounded," was not motivated by "actual malice"). It is equally clear that simple negligence is insufficient to rebut the presumption of good faith. *See Lara v. City of New York*, 187 Misc. 2d 882, 891, 726 N.Y.S.2d 217, 224 (Supr. Ct. N.Y. Co. 2001) ("Negligence, even if established, is not synonymous with bad faith.").

Good faith, like reasonable cause, must be evaluated in light of the information available to the reporter at the time of her report. Thus, facts that could not have been known to the reporter at that time – whether inculpatory or exculpatory – are irrelevant to the good faith analysis. *See Thomsen*, 2016 WL 590235, at *13 (S.D.N.Y. Feb. 11, 2016) (plaintiff's post-arrest "confessions" "cannot retroactively absolve Kefalas of the bad faith and malicious intent with which she allegedly brought her reports to IPS and the NYPD"); *see also Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348, 354–55, 912 N.E.2d 26, 29 (2009) (the actual malice inquiry looks to "the state of mind of the publisher . . . at the time of publication").

### C.    Evidence

In analyzing the Act I have relied on the statute itself, the cases interpreting it, and the arguments of the parties' counsel. I did not rely on the expert declaration of attorney Wolowitz, notwithstanding that his practice "involves extensive analysis of applicable mandated reporting laws." Wolowitz Decl. ¶ 1. The bulk of his declaration consists of a series of assertions as to how the Act should be interpreted and how it should be applied in this case. Specifically, attorney Wolowitz contends (without citing any cases or other authority beyond the Act itself) that both the "reasonable cause" standard set forth in § 413 and the "good faith" standard set forth in § 419 are "subjective." *Id*. ¶¶ 7-13. From this he concludes that if Kefalas "subjectively believed that the behavior she had witnessed was abusive," she was both obligated to report it and immune from any resulting liability. *Id*. ¶ 13.[26]

It is well-settled in this Circuit that expert opinions as to the interpretation and application of domestic law are inadmissible. *See Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509-510 (2d Cir. 1977) (holding that a lawyer called as an expert witness could explain customary "practices" in the securities industry, but that it was error to admit his "legal opinions as to the meaning of the contract terms at issue" or his "conclusions as to the legal significance of various facts adduced at trial"). "As Professor Wigmore has observed, expert testimony on law is excluded because 'the tribunal does not need the witness' judgment . . . [T]he judge (or the jury as instructed by the judge) can determine equally well'" what the law is – and how it should be applied to the facts of the case – thus making "the witness' testimony superfluous." *Id*. at 510 (quoting VII Wigmore on Evidence § 1952, at 81). Accordingly, a district court must "exclude

---

[26] As noted above, defendant's litigation counsel took a more nuanced position at oral argument, conceding that a mandated reporter's obligation to call the SCR is governed by an objective standard. Tr. of Feb. 24, 2017 Hr'g at 11:5-12:11.

expert testimony that 'provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (citing *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005)). The operative provisions of the Wolowitz Declaration consist entirely of prohibited legal opinion and legal conclusions, and for that reason will be disregarded.

## III.    ANALYSIS

In this case, after reviewing the record in the light most favorable to plaintiff Thomsen, *see Cronin*, 46 F.3d at 202, I conclude that defendant Kefalas was a mandated reporter and that her report was made within the scope of her employment. However, plaintiff has raised triable issues of fact, precluding summary judgment, as to (a) whether defendant had reasonable cause to suspect child abuse and (b) whether her report was made in good faith.

### A.    Kefalas was a Mandated Reporter

Plaintiff argues that Kefalas is not entitled to statutory immunity because she waited too long to call the SCR and was no longer a teacher – and therefore no longer a mandated reporter – when she finally did so on June 11, 2014. *See* Pl. Mem. at 18-21. Noting that the duty to report attaches "immediately," N.Y. Soc. Serv. L. § 415, but that defendant waited until a week after her employment was terminated to make her report, plaintiff concludes that she could not have been acting "in the discharge of [her] duties and within the scope of [her] employment," as required by § 419. Pl. Mem. at 20-21.

I am not persuaded. The reporting requirement is triggered when "a child coming before [the mandated reporter] in [her] professional or official capacity is an abused or mistreated child." It is undisputed that Kefalas's reporting obligation arose – if at all – while she was employed at IPS and while the children in the Blue Room came before her in her "professional

. . . capacity." Once the reporting requirement is triggered, it does not expire with the end of the reporter's employment. *See Hilbert S. v. Cty. of Tioga*, 2005 WL 1460316, at *1 n.3 (N.D.N.Y. June 21, 2005) (fact that Department of Social Services employee was no longer employed by DSS was "irrelevant" to claims against her for, *inter alia*, failing to report suspected child abuse). Since the good faith presumption and the obligation to report go hand in hand, it would make little sense to strip a teacher of the presumption the moment she loses her job while continuing to mandate – on pain of civil and criminal liability, *see* N.Y. Soc. Serv. L. § 420 – that she report suspected abuse. Consequently, while it is undisputed that Kefalas's employment was terminated a week before she made her report, this fact, standing alone, is not grounds for denying her summary judgment motion.

### B.  Questions of Fact Exist as to Reasonable Cause

In Kefalas's view of the law, once a mandated reporter has called the SCR she is immune from civil liability, pursuant to the presumption of good faith built into N.Y. Soc. Serv. Law § 419, unless the plaintiff rebuts that presumption by making "a **persuasive** showing that the reporter acted with malice or ill-will." Def. Mem. at 7 (emphasis in the original). Therefore, Kefalas reasons, since she has "maintained at all times that she believed the plaintiff was engaging in inappropriate behavior," *id*. at 8, and since no witness has "stated that [she] fabricated her claims . . . or that her reports were the result of malicious intent," *id*., defendant is entitled to summary judgment. *See also* Def. Reply Mem. at 2 (arguing that defendant is entitled to summary judgment because there is no evidence that she "did not subjectively believe that the plaintiff had committed inappropriate conduct").

Leaving aside, for the moment, that adjudicating the "persuasiveness" of a factual showing is a task for the trier of fact at trial – not the court on summary judgment – defendant's analysis is flawed in several respects. First, she ignores the teaching of *Goldberg I* and its

progeny that statutory immunity "attaches" only where (1) "there is reasonable cause to suspect that the child might have been abused," *and* (2) "the reporting party has acted in good faith." *Goldberg I*, 41 A.D.3d at 428, 838 N.Y.S.2d at 146; *accord Kempster*, 130 A.D.2d at 625, 515 N.Y.S.2d at 509. Thus, in addition to the evidence as to "good faith," I must also consider the evidence as to "reasonable cause." *See Biondo*, 66 A.D.3d at 727, 888 N.Y.S.2d at 77 (affirming denial of summary judgment where there were "triable issues of fact" as to whether defendants had "reasonable cause" to suspect child abuse); *Vacchio*, 1995 WL 17959412, at *4 (denying motion to dismiss where complaint alleged facts calling into question whether defendant had reasonable cause to suspect abuse).

Second, while "reasonable cause" is a generous standard – consistent with the overall goal of the Act to encourage the reporting of suspected abuse – it is not, as defendant argues, "a subjective one." Def. Mem. at 5. Reasonable cause must be judged objectively, in light of the information available to the reporter at the time of her report. *Vaccio*, 1995 WL 17959412, at * 3 (quoting *People v. Brooks*, 88 A.D.2d 451, 454, 453 N.Y.S.2d 740, 742-43 (2d Dep't 1982)) (reporter's belief "must be based upon articulable facts which, *when examined objectively*, would lead others to the same conclusion") (emphasis added); *see also, e.g.*, *Kempster*, 130 A.D.2d at 625-26, 515 N.Y.S.2d at 809-810 (defendants had "reasonable cause" to suspect child abuse based on "the medical data and other available information" when the report was made). Viewing the evidence from this perspective, I conclude that plaintiff has raised a triable issue of fact as to whether Kefalas had "reasonable cause" to suspect that he was sexually abusing the young children in his care.

The record is striking for the number of adult witnesses who were present, along with Kefalas, when the alleged abuse occurred – and in some instances were actively looking for

evidence of it – but saw no sign of inappropriate behavior. Unlike many cases involving allegations of sexual misconduct with children, the misconduct at issue here took place in public or semi-public settings. Thomsen was always in plain view of at least two permanent teachers in the Blue Room. *See* Baraie Dep. Tr. at 11:19-12:10 (two permanent teachers were required to be in the room at all times); *id*. at 21:22-24 (Thomsen was never alone with any students); Kefalas Interrog. Resp. No. 11 (either Baraie or Weisz were "usually" present when the alleged misconduct occurred; Green, Finkelstein and Cohen "may also have been present"). At the zoo – when according to Kefalas's initial interview with Kane plaintiff stood behind the children in line and "rub[bed] their heads against his genitals," Kane Dep. Tr. at 29:21-30:7 – he and the children were accompanied by all three Blue Room teachers and multiple parents. Baraie Dep. Tr. at 24:18-24:4 (each child was accompanied by an adult). And on June 3, 2014 – when Kefalas texted her father that Thomsen was "still doing it," and named two different children as his victims – he was under direct observation by Location Director Green and Developmental Specialist Finkelstein. Indeed, in her texts that day, Kefalas confirmed that "the psychologist" (Finkelstein) was "looking at him" while he was "doing it." Kefalas Texts at ECF page 17.[27]

All of these witnesses were interviewed by CAO Kane, and one of them, Sarah Baraie, has been examined under oath. Baraie testified that she "never" saw Thomsen interact

---

[27] Significantly, the two occasions on which Thomsen was under the most scrutiny – May 22, when the Blue Room went to the zoo, and June 3, when Green and Finkelstein were dispatched to observe his behavior – are also the two occasions as to which Kefalas has given inconsistent accounts, at some points insisting that plaintiff committed clear misconduct in full view of adult observers, while at other points stating that nothing suspicious occurred while those observers were present. Regarding the zoo trip, *compare* Kane Dep. Tr. at 29:21-31:15 (Kefalas told Kane that Thomsen rubbed the childrens' heads against his genitals during the zoo trip, which no one else noticed) *with* Kefalas Dep. Tr. at 110:12-17 (testifying that nothing "suspicious" occurred on the field trip). Regarding the events of June 3, when Green and Finkelstein were observing, *compare* Kefalas Texts at ECF pages 17-18 (telling her father that Finkelstein was "looking at

inappropriately with IPS students. Baraie Dep. Tr. at 21:15-24; *see also id*. at 22:4-23:17 (testifying that she did not witness any of the specific acts of misconduct reported by Kefalas). Similarly, it is undisputed that both Finkelstein and Green denied observing any misconduct by Thomsen. Pl. 56.1 Stmt. ¶ 147; *see also* IPS Invest. Notes at ECF pages 84-85, 86-87; Kane Dep. Tr. at 14:13-18:4, 48:15-54:24. Nor did any other observer corroborate Kefalas's claim that after the zoo trip the children "all began to play with themselves." Kane Dep. Tr. at 32:2-3. Moreover, Kefalas knew that IPS was investigating, and knew – because Kane told her so on June 5, 2014 – that the school had been "unable to corroborate any of these allegations." *Id*. at 79:25-81:12.[28]

Kefalas also knew that her cellphone videos – which she recorded over many days in the Blue Room, sent to her father, but refused to show to IPS – did not "show anything suspicious." Kefalas Texts at ECF page 2. Her father explicitly advised her, on May 30 and again on June 2, 2014, not to tell IPS about the videos. *Id*. at ECF pages 7-9. She followed that advice, even though it ultimately cost her her job.

---

him . . . doing it" and that Finkelstein "saw it") *with* Kefalas Decl. ¶ 20 ("Of course, the plaintiff committed no further misconduct in the presence of the two adults.").

[28] The parties vigorously dispute whether Kefalas's charges were corroborated, *after* she called the SCR, by the statements that Thomsen made to Det. Gomez and ADA Ferrarri. Those statements may be admissible at trial, where the truth of Kefalas's charges will be in issue. On summary judgment, however, the issue is not whether defendant's report was true; it is whether she is entitled to statutory immunity for making it. Evidence going to facts that she could not have known when she called the SCR on June 11 cannot be relevant to her good faith on that date. *See Thomsen*, 2016 WL 590235, at *13 (Thomsen's statements to the NYPD "cannot retroactively absolve Kefalas of the bad faith and malicious intent with which she allegedly brought her reports to IPS and the NYPD"). Nor could such evidence bear on whether she had reasonable cause for her charges at the time she made them. *See generally Quezada v. Bakraqi*, 2017 WL 4286646, at *7 (S.D.N.Y. Sept. 7, 2017) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)) ("In evaluating probable cause, the court is to 'consider the facts available to the officer at the time of the arrest.'"), *report and recommendation adopted*, 2017 WL 4296787 (S.D.N.Y. Sept. 26, 2017).

It is possible, of course, that notwithstanding the apparent brazenness of the conduct that Kefalas described, *see, e.g.*, Kefalas Texts at ECF pages 16-17 (telling her father that Thomsen "is still doing it now," under Finkelstein's gaze, leaving defendant "speechless" and "short of breath"), she was the only adult who noticed it. It is also possible, at least in theory, that – as Kefalas repeatedly suggested to her father and the NYPD – Baraie, Weitz, Finkelstein, and Green all saw the same misconduct that she saw, but chose to conceal it in order to protect their jobs and/or the reputation of IPS. *See* Kefalas Texts at ECF page 6 ("they are covering up everything"); Kefalas Dep. Tr. at 187:7-188:8 (Kefalas feared that IPS "would try to cover it up" because "they saw the children as checks, money checks," and she "wasn't certain" that school administrators would "care" if children were being molested). Similarly, it is possible that, due to the surreptitious nature of defendant's attempt to obtain evidence, she was simply unable to capture, on video, that which she saw in plain view on multiple occasions in the parties' shared workplace. The finder of fact at trial might also credit defendant's explanation that she was reluctant to show the videos to Kane because she had lost faith in the IPS investigation, *see* Gomez Dep. Tr. at 120:5-11 (Kefalas told the NYPD that "she didn't feel comfortable providing Paul Kane with any of the recordings that she had because she didn't trust that they would conduct a proper investigation"), rather than because they showed innocent conduct.

But these are questions for trial. Where, as here, the record contains evidence from which a jury could infer that Kefalas did not see any inappropriate conduct by Thomsen – and where she had no basis for making her report other than what she herself witnessed him do – summary judgment would be inappropriate. *See Biondo*, 66 A.D.3d at 727, 888 N.Y.S.2d at 77 (where school employees called child abuse hotline based on witnessing allegedly abusive interaction between plaintiff mother and her two-year-old child, but there was conflicting testimony as to

what took place during that interaction, "the Supreme Court properly determined that there are triable issues of fact as to whether the defendant school district employees had reasonable cause to suspect possible child abuse").

### C.    Questions of Fact Exists as to Good Faith

The record also contains evidence sufficient to raise a triable issue of fact as to whether Kefalas made her report in good faith. Once again, defendant's presentation of the applicable legal principles is somewhat overstated. At this stage of the case, plaintiff need not "demonstrat[e] that the alleged defamatory statements were known to be false." Def. Mem. at 7 (quoting *Breen v. Leonard*, 198 A.D.2d 392, 393, 604 N.Y.S. 2d 169 (2d Dep't 1993)).[29] In order to defeat summary judgment, plaintiff need only point to evidence from which a jury could conclude that Kefalas acted with "willful misconduct," N.Y. Soc. Serv. Law § 419, "gross negligence," *id.*, "actual malice," *see Miller*, 82 A.D.2d at 913, 440 N.Y.S.2d at 692, or "ill will." *Id.* While all of these tests include "subjective *mens rea* elements," *Treistman v. Greene*, 2017 WL 5201555, at *3 (N.D.N.Y. Nov. 9, 2017), direct evidence of the defendant's internal mental state is not required. *See, e.g.*, *Stratakis*, 308 A.D.2d 397 at 398, 764 N.Y.S.2d at 432 (summary judgment denied where evidence of a "strained relationship" and "verbal confrontations" between plaintiff and defendant was sufficient to suggest that defendant's report may have been retaliatory); *Hachmann*, 29 A.D.3d at 953, 818 N.Y.S.2d at 104 (summary

---

[29] *Breen* did not arise under the Act, and consequently did not involve any analysis of the good faith standard set forth in § 419. The defendant in *Breen* was a pediatrician who wrote an allegedly libelous letter about the plaintiff midwife to the hospital where she practiced, resulting in the termination of her privileges. At deposition, the pediatrician admitted that part of his letter was factually false, and that he had "never made an effort to ascertain the correctness" of another portion. 198 A.D.2d at 393. Noting that in libel cases "malice may be shown by demonstrating that the alleged defamatory statements were known to be false at the time of publication," *id.* the appellate court held that a jury "could infer malice" from the facts admitted at deposition, and reversed the trial court's grant of summary judgment to the defendant. *Id.* at 394.

judgment denied where plaintiff father raised an "issue of fact as to malice" by alleging that he threatened to complain to school superintendent shortly before defendant school principal called child protective services to report father).

Plaintiff has met his burden. To begin with, there is conflicting evidence – as discussed above – as to whether Kefalas actually saw Thomsen engage in any of the behavior of which she accused him. That evidence goes to Kefalas's good faith as well as to the existence of reasonable cause. *See Biondo*, 66 A.D.3d at 727, 888 N.Y.S.2d at 77. Moreover, Kefalas's inconsistent accounts of Thomsen's conduct at the zoo on May 22, and at IPS on June 3, 2014, could help persuade a jury that her statements as to those events were fabricated, thus raising broader questions as to her credibility.

There is also evidence that, even before she was fired, Kefalas was nursing multiple grievances against IPS personnel. She admits that she had a "strained and, at times, difficult relationship with Ms. Baraie and other IPS employees such as Mona Green." Def. Reply Mem. at 9. In fact, she appears to have had "strained" and "difficult" relationships with all of her Blue Room co-workers. Baraie, Weitz and Thomsen "were all friends," leaving Kefalas "an outsider." Pl. 56.1 Stmt. ¶ 77. This was clear even to Det. Gomez, who testified, "It was obvious, based on what Ms. Kefalas communicated, that the other teachers weren't friendly with her and that she seemed to be kind of out-casted." Gomez Dep. Tr. at 100:9-13; *see also id*. at 111:19-112:7. In addition, as Gomez noted, there was "a lot of conflict" between Kefalas "and the other teachers." *Id*. at 99:9-15.

This may have been an understatement. It is undisputed that, by the time she first accused Thomsen of sexual misconduct, Kefalas had been feuding with Baraie for months. She made multiple reports about Baraie to IPS administrators, including allegations about professionally

inappropriate wardrobe choices, *see* Kefalas Dep. Tr. at 69:16-70:10 (Baraie wore "very short" skirts), and sexually inappropriate conduct, *see* Kane Dep. Tr. at 199:3-7 (Kefalas complained that Baraie "like[d] to hit on fathers in the room" and "flirt with all of the male administration"). Kefalas also made secret audio recordings of Baraie, which she later played for Det. Gomez. Pl. 56.1 Stmt. ¶ 69; Kefalas Dep. Tr. at 75:4-77:7; Gomez Dep. Tr. at 36:12-37:15. According to Baraie, the relationship between the two assistant teachers got even worse after April 16, 2014, when Director Cohen offered Kefalas a "floater" position for the 2014-15 school year, which could be considered a demotion. Baraie Dep. Tr. at 36:18-37:4; *see also* Def. Reply Mem. Ex. 2. From that point forward, "[t]here was always a conflict, always." Baraie Dep. Tr. at at 44:6-7.[30]

Kefalas also held a low opinion of head teacher Weitz, who was the subject of at least one of her complaints, *see* Kefalas Dep. Tr. at 310:5-12 (defendant "may have said" that Weitz "cannot handle the role of head teacher"), and whom she characterized as incompetent. *See id.* at 266:7-8 (Weitz "wasn't even capable of opening a ketchup bottle"). Moreover, Weitz signed Kefalas's May 14, 2014 performance review, which noted that Kefalas needed to improve her working relationship with team members, and reported that there were "some times" when Kefalas "said inappropriate things" to parents. Ass't Teacher Rev. dated May 14, 2014, at ECF pages 67-68. Kefalas told her father that the review contained "gross accusations," "[o]n Gillian's behalf btw," Kefalas Texts at ECF page 16, and added that she could not have said inappropriate things to parents because "they didn't allow me to talk during [parent] conference[s] because I was Greek." *Id.* at ECF page 12.

---

[30] When head teacher Weitz was interviewed by CAO Kane, she too stated that defendant's behavior changed after she was offered the floater position; that Kefalas became "rebellious"; and that Weitz approached Green several times "requesting a mediation." IPS Invest. Notes at ECF page 82; *see also* Kane Dep. Tr. at 61:25-63:19.

Defendant points out, correctly, that there is no direct evidence in the summary judgment record showing personal animus between Kefalas and Thomsen predating her initial reports (made to her father, by text) of inappropriate conduct by Thomsen. Def. Reply Mem. at 9.[31] In those texts, however, Kefalas frequently linked Baraie and Thomsen, characterizing Baraie's conduct in terms at least as stong as those she used for Thomsen himself. For example, on May 22, 2014, Kefalas texted, "*They* belong in prison Sarah and the other one [male]," followed by, "*She* is not well I am wondering how *she* is walking free." Kefalas Texts at ECF pages 3-4 (emphases added). Defendant's father replied, "let *her* break to get arrested." *Id.* at ECF page 4 (emphasis added). In later texts, Kefalas described Baraie and Thomsen as a "team" and expressed resentment when she saw that team being unfairly (in her view) favored by Green and other IPS administrators. She also bridled at Green's effort, on May 29, 2014, to redirect Kefalas's focus while in the classroom. *See* Kefalas Dep. at 151:12-24.

The next day, Green removed Kefalas from the Blue Room (albeit temporarily), prompting defendant to send the following texts to her father:

> So Mona [Green] was accusing me to the other teachers
> That I am the problem
> And that Sarah and Malthe are a super team?
> And she took me out?
> The bitch

Kefalas Texts at ECF page 6. In response, Vassilios Kefalas advised defendant to report Thomsen's conduct to Green. In the same text, he expressly told her not to mention her video evidence but instead, if asked, to say "that the head teacher and Sarah should have witnessed it

---

[31] The record includes texts between Kefalas and her father from May 19 through June 5, 2014. A few of those texts – for example, Kefalas's repeated references to Thomsen as "the fat one" – suggest some level of dislike or disdain unrelated to the alleged misconduct at issue in this action. The parties' summary judgment papers do not indicate whether any earlier texts exist – or were produced – that would shed light on this question.

but they are not doing anything about it." *Id.* at ECF page 7. "Then Mona will have the responsibility.. When you tell her send me email exactly what you said so that we have evidence.." *Id.* That evening, Kefalas first reported her allegations concerning Thomsen to IPS. Def. 56.1 Stmt. ¶¶ 20-21, 41; Pl. 56.1 Stmt. ¶¶ 58, 81.

From this evidence, a juror could rationally infer that Kefalas desired to tarnish the reputation of Baraie and Weitz in Green's eyes – and that she (and her father) saw her accusations against Thomsen as a way of accomplishing that goal, while also saddling Green with the "responsibility" for any failure of oversight in the Blue Room. Some of defendant's later texts appear consistent with that narrative. For example, on June 4, 2014, Kefalas complained to her father that "[e]veryone is laughing . . . apparently with me," to which he responded, "laughs best the last one," Kefalas Texts at ECF page 23, once again suggesting that some element of score-settling may have been in play. Clearly the strength of Kefalas's dislike for Baraie had not abated. That same day, defendant called Baraie a "fucking animal" and claimed that "she was always jealous of me!" *Id.* at ECF page 27.

The following day – June 5, 2014 – Kefalas was told that IPS had been unable to corroborate her allegations, *see* Kane Dep. Tr. at 79:25-81:12, but steadfastly refused to let Kane see the video evidence that she had created, leading to her termination. A jury could infer from this conduct that Kefalas recognized that her videos did not in fact show any misconduct, notwithstanding her assertion to IPS that she had "evidence . . . that would show that the children were unsafe." *Id.* at 68:19-24; *see also* IPS Invest. Notes at ECF page 83.

Finally, it is undisputed that, although Kefalas was well aware of her obligations as a mandated reporter, knew that Thomsen was teaching in the IPS summer camp program, and had insisted as recently as June 4, 2014, that he be immediately removed from the classroom, she did

not call the SCR until after she was fired, and then waited another week, until June 11, 2014, to make the call. From this evidence a juror could conclude that defendant was considerably less concerned about the safety of the children than she had represented. Alternatively – as Judge Cote noted when ruling on defendants' motions to dismiss – these facts could support the inference that Kefalas "made her report to the NYPD in retaliation for the termination of her employment." *Thomsen*, 2016 WL 590235, at *12.[32]

Again, it is entirely possible that the finder of of fact will draw a different conclusion. As Kefalas notes in her briefs, she has consistently maintained that she accused Thomsen – first to IPS, and then to law enforcement authorities – because she genuinely believed he was engaging in sexual misconduct with multiple preschoolers. Again, however, that is a question for the jury. *See Rossignol v. Silvernail*, 185 A.D.2d 497, 500, 586 N.Y.S.2d 343 (3d Dep't 1992) (upholding jury verdict "that defendants did not act in good faith in making the child abuse complaints"). As Judge Cote noted when denying Kefalas's motion to dismiss, the complaint "specifically alleges facts that support Thomsen's allegation that Kefalas intentionally and in bad faith filed false reports against him." *Thomsen*, 2016 WL 590235, at *12. Most of those allegations are now supported by evidence. Moreover, discovery has revealed additional evidence – such as Kefalas's inconsistent accounts of what she saw at the zoo and on June 3, 2014 – that could also be used to rebut the presumption of good faith furnished by N.Y. Soc. Serv. Law § 419.

---

[32] Kefalas fully appreciated the impact that a sex abuse scandal could have on IPS. Indeed, she testified that she did not trust IPS to investigate her claims because "I thought they would try to cover it up." Kefalas Dep. Tr. at 187:11-12. *See also id*. at 187:17-18 ("Because they – they saw the children as checks, money checks.").

# IV.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED. The Clerk of Court is respectfully directed to close Dkt. No. 146. Counsel shall appear for a trial setting conference on April 26, 2018, at 11:00 a.m., and shall be fully informed as to the availability of their clients and anticipated witnesses for trial from July through September, 2018.

Dated: New York, New York
      March 26, 2018

**SO ORDERED.**

**BARBARA MOSES**
**United States Magistrate Judge**